# United States Court of Appeals
## For the Eighth Circuit
_____

No. 22-3290
_____

Kameron Evans; Noah Evans

*Plaintiffs - Appellees*

v.

Cabot School District; Tony Thurman, Superintendent; Henry Hawkins, Principal

*Defendant*s

John Dodd, Individually; Brittany Taunton, Individually

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: April 10, 2024
Filed: August 15, 2024
_____

Before LOKEN, MELLOY, and KOBES, Circuit Judges.
_____

MELLOY, Circuit Judge.

Two high school brothers were arrested for disorderly conduct after wearing tactical vests to school. After an Arkansas state court acquitted the brothers, they brought § 1983 and state tort claims against two school resource officers. The

officers moved for summary judgment and asserted they were entitled to qualified immunity, which the district court denied. The officers appeal. We affirm in part and reverse in part.

## I.

Kameron and Noah Evans (collectively, the "Evanses") started attending public school in Cabot, Arkansas when they were 13. Prior to that, the Evanses lived in Cambodia, where they were born. Kameron and Noah have brown skin and allege that, since attending the Cabot School District, they have been bullied and subjected to near-daily name-calling because of their race and ethnicity. For example, the Evanses have been called "terrorists" and told to show their green cards or "go back to where they came from." In eighth grade, students spread a false rumor about Kameron based on a video of a slim, brown-skinned person burning a flag. As a result, a group of students gathered and threatened Kameron to the point that he had to be escorted to class by a police officer for multiple days following the incident. When the Evanses reported bullying to school officials, the brothers faced more retaliatory bullying from students. They allege the school officials were unresponsive.

During the 2017–18 school year, Kameron openly supported the Black Lives Matter movement and Colin Kaepernick's decision to kneel during the singing of the National Anthem at football games. Although Kameron himself did not kneel during the National Anthem, he expressed his support on social media. As a result, students again made threats to Kameron. When one of Kameron's instructors learned of these threats, the instructor reported them to the principal because he was afraid for Kameron's safety.

That same school year, the Evanses were both cadets in the Cabot High School Air Force Junior Reserve Officers' Training Corps ("ROTC"). The Evanses participated in ROTC in part because they were enthusiastic about the military and military-related things, including war-related games. The Evanses would play these

games with other kids using Airsoft guns, which are plastic toy guns that look real and shoot soft plastic pellets. Airsoft guns and games are geared toward both adults and children.

Defendants are Officers John Dodd and Brittany Taunton (collectively, "Officers"). Officers Dodd and Taunton were school resource officers at Cabot High School during the 2017–18 school year. School resource officers are members of the Cabot Police Department who are assigned to provide security to high schools. The Cabot School District partners with the City of Cabot to employ two-to-four school resource officers each year and cover a portion of the officers' salaries. The Officers were familiar with the Evanses and had spoken with them on occasions prior to the events giving rise to the instant case.

On February 13, 2018, Kameron and Noah both wore military-style tactical vests to school. Kameron's vest had a "U.S. Army" patch on it. The parties agree that the vests were not real tactical or military vests, nor were they bulletproof. Kameron's vest was mostly obscured under a large winter coat he was wearing. Noah did not have his coat on over his vest. Kameron also carried a green duffle bag that he used to carry his ROTC equipment. The Officers describe the bag as a "military-style duffle bag," but the Evanses dispute that the duffle bag was military-style. Kameron alleges that he regularly used the bag to carry his marching band and ROTC equipment, in addition to his Airsoft war game equipment.

Cabot High School's assistant principal, Adam Koehler, testified that the Evanses' vests did not violate the Cabot High School dress code. Indeed, the parties agree that prior to the Evanses wearing their vests to school, at least two white students had worn similar tactical-style vests to school and were not disciplined. One of these students wore a full military uniform including a bullet-proof vest, a nerf gun, and a helmet.

On the day the Evanses wore their vests to school, Cabot High School was screening a video on what to expect and how to respond in the event of an active

shooter at school. School officials had notified students and parents a week prior, alerting them to the screening. Kameron and Noah's mother received a robocall informing her of the video, but the brothers maintain they were unaware of the screening that was taking place that day. Kameron asserts that he did not know the screening was taking place until it started playing in his second-period class. Noah says he was unaware of the video until after he was arrested.

After Kameron's first period, two students in the class approached the teacher, Ms. Heather Nelson McGhee, to tell her that Kameron was wearing a tactical vest underneath his coat. According to a school incident report written by of one of the students, the students were irritated that Kameron was wearing a vest with military patches affixed to it, including a U.S. Army patch. The Evanses argue that the two students reported Kameron's vest "because they were mad at him for calling them racist." It is unclear from the facts whether the two students had safety concerns in mind when they reported Kameron, but Ms. McGhee testified that the two students appeared nervous to tell her about the vest and waited for Kameron to leave before they told her. Based on the students' report, Ms. McGhee immediately contacted Mr. Koehler out of concern.

After receiving Ms. McGhee's call, Mr. Koehler contacted Officer Taunton. Mr. Koehler then pulled Kameron from class to discuss his vest and bag. In the hallway, Officer Dodd and Officer Taunton met Mr. Koehler and Kameron. Both Officers' body cameras recorded the interaction between Mr. Koehler, the Officers, and Kameron. In the school hallway, Officer Dodd asked Kameron to open his coat so he could see the vest. Officer Dodd explained to Kameron that if they thought a student was wearing a Kevlar vest to school, they could infer the student was going to do something wrong. Officer Dodd then explained that, even though he personally knew Kameron, they needed to search his clothes and bag.

Officer Dodd asked Kameron to take off his coat and vest, which Kameron willingly did. Mr. Koehler searched Kameron's person, while the Officers searched the vest. Mr. Koehler found nothing, and the Officers found no weapons, ballistic

-4-

panels, or plates in the vest. Mr. Koehler and the Officers then handed the vest and coat back to Kameron, which Kameron held onto but did not put back on. Mr. Koehler then searched Kameron's green duffle bag. While Mr. Koehler searched the bag, the Officers asked if Kameron could understand how carrying the duffle bag and wearing his vest on the same day as an active-shooter training could cause alarm, and Kameron agreed that he saw how it could. Officer Taunton clarified to Kameron that there was "nothing wrong, having a bag was a great idea to put all [his] stuff in it," just "not all of it together," indicating wearing the vest and carrying the bag. As Mr. Koehler searched Kameron's duffle bag, he discovered a cartridge of Airsoft pellets. When Mr. Koehler found those, Kameron stated that he did not know why the pellets were in his bag and that he must have left them in there after playing an Airsoft game a couple days prior. Kameron explained that, had he known about the pellets, he would not have brought them to school.

While searching Kameron and his belongings, the Officers engaged him in casual conversation, for example, as Kameron was taking off his vest, Officer Taunton stated that she "like[d] the buckles on the side." When Mr. Koehler took snacks out of Kameron's duffle bag, Officer Taunton jokingly asked Kameron why he had not kept them in the many pockets of his vest and then, laughing, she repeated that it "was kind of a bad day" to wear the vest. During the entire search of Kameron's duffel bag and vest, he was calm, respectful, and cooperative. Whenever the Officers or Mr. Koehler asked Kameron a question, he was polite and responsive.

At the conclusion of the search, Officer Dodd asked Officer Taunton and Mr. Koehler if they were okay with Kameron "walking around with a tactical vest at school." Though it is unclear whether Officer Dodd was referring to Kameron walking with the vest in his duffle bag or on his body, Mr. Koehler was unsure how to proceed, so they decided to all walk across Cabot High School's outdoor campus to speak with the principal. In the video, Kameron quietly walks in front of Mr. Koehler and the Officers as they walk to the principal's office.

Mr. Koehler and the Officers met with the principal, Henry Hawkins, while Kameron sat in a waiting area outside the office. In her police report, Officer Taunton wrote that, during their meeting, they "discussed what the school wanted Cabot Police to do," and that Principal Hawkins "advised he wanted Cabot Police to arrest [Kameron] and charge him" because he had "alarmed the students and staff with his actions." The Evanses allege that Officer Taunton turned off her camera over the course of six minutes while the Officers were meeting with Principal Hawkins discussing how to respond. The Evanses allege that during the time when the camera was turned off, Principal Hawkins made the decision to arrest Kameron, and the Officers were following his orders. Additionally, both Officers testified that Principal Hawkins made the decision to arrest Kameron and Noah.

After their meeting, Officer Taunton came out of Principal Hawkins' office and handcuffed Kameron in the waiting room while Officer Dodd told him he was being arrested. The Officers walked Kameron out of the school building in handcuffs, and Officer Taunton transported him to the Cabot Police Department. Once at the police station, Kameron requested his mother be present during questioning. Kameron's mother, Kerri Evans, later arrived at the police station, and thereafter, Officer Taunton issued a juvenile citation for disorderly conduct and released Kameron. Ms. Evans testified that Officer Taunton told her Kameron was arrested because Principal Hawkins wanted him arrested and because Officer Taunton believed she had to follow Principal Hawkins' instructions.

While at the police station, Ms. Evans informed Officer Taunton that Noah was also wearing a tactical vest. Officer Taunton then notified Officer Dodd back at the high school, and he and Mr. Koehler removed Noah from class. The Officers present no facts that any students or teachers complained about Noah's vest or that his vest caused any disruption. Officer Dodd and Mr. Koehler searched and interrogated Noah. During the search, Officer Dodd and Mr. Koehler did not find any weapons, ballistic panels, pellets, or plates.

-6-

While searching through Noah's backpack and vest, Mr. Koehler was notified via his walkie talkie that Ms. Evans had arrived at the school. Ms. Evans was there to pick up Noah, and the Evanses allege that the Officers and school officials prevented her from doing so. Before Officer Taunton arrested Noah, Officer Dodd explained that they had to arrest him because he could not wear a tactical vest to school and also because they had arrested another student, alluding to Kameron, and needed to treat students the same. Thereafter, Noah was taken to the police station and charged with disorderly conduct.

Later that day, Ms. Evans and Kameron returned to Cabot High School to meet with Principal Hawkins about the arrests. The Evanses allege that Principal Hawkins told them that, regarding Kameron's Black Lives Matter and Colin Kaepernick posts, he could not "walk around CHS after posting stuff like that and expect anything different." The Evanses allege that Principal Hawkins further called Kameron's content supporting Black Lives Matter "racist social media posts" and "not right."

Kameron and Noah were each suspended from school for five days, and upon returning to school, Kameron was moved to an alternative learning environment instead of being allowed to return to regular school. Ms. Evans ultimately withdrew both Kameron and Noah and decided to homeschool them, which they allege was out of fear for their safety. Ms. Evans also contacted Cabot School District's superintendent alleging that Principal Hawkins had retaliated against Kameron for supporting Black Lives Matter and Colin Kaepernick. Ms. Evans also demanded the superintendent drop charges against Kameron and Noah. According to the Evanses, both the superintendent and Principal Hawkins claimed that, because Officer Dodd made the decision to arrest and prosecute, the Cabot School District lacked the ability to drop charges. The case proceeded to trial, and after a bench trial, the state court found Kameron and Noah were not guilty of violating Arkansas' disorderly conduct statute, Ark. Code Ann. § 5-71-207.

Thereafter, the Evanses brought this § 1983 lawsuit against both Officers Dodd and Taunton in their individual capacities.[1] The Evanses alleged that the Officers lacked probable cause and used excessive force in violation of their Fourth, Fifth, and Fourteenth Amendment rights. The Evanses also alleged the Officers engaged in malicious prosecution, abuse of process, and false arrest under Arkansas law. The Officers moved for summary judgment on all charges based on qualified immunity. The district court denied the motions, and the Officers now appeal. We affirm in part and reverse in part.

II.

The Officers argue that the district court erred in denying their motions for summary judgment and that they are entitled to qualified immunity. The Court reviews the denial of summary judgment based on qualified immunity de novo, viewing the record in the light most favorable to the Evanses and drawing all inferences in their favor. *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). On appeal from an order denying qualified immunity, the Court may review issues of law, but we lack jurisdiction to review factual disputes or "to review the district court's determination regarding evidence sufficiency—*i.e.*, what facts a party may or may not be able to prove at trial." *Thompson v. Murray*, 800 F.3d 979, 982–83 (8th Cir. 2015). Qualified immunity will shield the Officers "from legal liability unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Thurairajah*, 925 F.3d at 982.

The Officers contend they are entitled to qualified immunity on the Evanses' Fourth Amendment unlawful arrest claim because they had probable cause, or at the very least arguable probable cause, to arrest the Evanses for disorderly conduct

---

[1]The Evanses also asserted claims against Principal Hawkins and the superintendent, but this appeal concerns only Officers Dodd and Taunton.

under Arkansas Code § 5-71-207.[2] "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (citation omitted).

"Probable cause exists when the totality of circumstances at the time of arrest would lead a reasonable person to think the defendant committed or is committing a crime." *Webster v. Westlake*, 41 F.4th 1004, 1010 (8th Cir. 2022). "To determine whether an officer had probable cause for an arrest, '[the Court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (citations omitted) (cleaned up).

The Officers begin by arguing they had "probable cause to arrest Kameron and Noah for disorderly conduct based on what they wore to school on that particular day." The Arkansas disorderly conduct statute states in part:

> (a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:
> > (1) Engages in fighting or in violent, threatening, or tumultuous behavior;

---

[2]The Arkansas state court issued an order after a bench trial and stated that "[t]he police had ample information to charge 'Disorder[ly] Conduct' under probable cause." This issue, however, was never litigated before the court, and therefore, it was a gratuitous statement with no force in the instant case. *Passmore v. Astrue*, 533 F.3d 658, 661 (8th Cir. 2008) (explaining that "[a] judicial comment made while delivering a judicial opinion . . . is unnecessary to the decision in the case and therefore not precedential").

> . . . .
>
> (4) Disrupts or disturbs any lawful assembly or meeting of persons;

Ark. Code Ann. § 5-71-207.

The Officers argue that the Evanses purposely or, at the very least, recklessly caused alarm by wearing tactical vests on a day when the school was screening an active-shooter video. The Officers do not expressly identify which of the enumerated disorderly acts the Evanses allegedly engaged in, though they seem to contend that the brothers' conduct disrupted a lawful assembly. *Id.* § 5-71-207(a)(4). For their part, the Evanses deny that they even knew about the active-shooter video. Regardless of whether the Evanses purposely or recklessly wore their vests to school, there was no disruption of a lawful assembly. The Officers present no evidence that the Evanses were disruptive. The Officers were only aware of Noah's vest because Ms. Evans informed them, and Kameron's teacher would not have known about the vest under his coat absent two students quietly bringing it to her attention after class. Officers argue that because two students reported Kameron's vest, the Evanses disrupted a lawful assembly. But students tell on other students all the time. Moreover, Ms. McGhee testified that Kameron's vest did not cause disruption in her class or during passing periods. The Officers also stated that the Evanses were respectful during their search and interrogation. In fact, Officer Dodd considered sending Kameron back to class with his vest.

Cases interpreting Arkansas' disorderly conduct statute further support the conclusion that the Officers were not objectively reasonable in arresting the Evanses for disrupting a lawful assembly. For example, in *Holloway v. State*, a man was convicted of disrupting a lawful assembly after attending a basketball game between two rival high school teams where the man threw soda, hamburgers, and French fries onto the floor of the gymnasium and swore and yelled at a game official. No. CA CR 88-78, 1988 WL 113858, at *1–2 (Ark. Ct. App. Oct. 26, 1988). Although there was no evidence that spectators left on account of his behavior, the Arkansas Court of Appeals nonetheless held that the defendant had disrupted a lawful assembly

because "the game had to be stopped to clean up the spilled soft-drink." *Id.* at \*2. Likewise, the Arkansas Supreme Court opined in dicta that a loud confrontation between defendants and a pastor in the middle of church services disrupted a lawful assembly, citing as authority disorderly conduct cases that predated Arkansas Code § 5-71-207. *State v. Kimbrough*, 578 S.W.2d 26, 27–28 (Ark. 1979). In both cases, the defendants' conduct interrupted an organized group gathering. No similar circumstances are present here. Accordingly, based on the totality of the circumstances and the facts viewed in the light most favorable to the Evanses, we cannot say as a matter of law that the Officers had probable cause to arrest both Kameron and Noah for disrupting a lawful assembly.

The Officers next argue they are entitled to qualified immunity because they had arguable probable cause to arrest the Evanses. "In a case involving an arrest without probable cause, officers have qualified immunity if they 'reasonably but mistakenly conclude[d] that probable cause [wa]s present.'" *Bell v. Neukirch*, 979 F.3d 594, 607 (8th Cir. 2020) (quoting *Wesby*, 583 U.S. at 49) (alterations in original). Where an officer argues they had arguable probable cause, the governing standard is "whether the officer should have known that the arrest violated plaintiff's clearly established right." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (citation omitted). "Clearly established" means that "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Brown v. City of St. Louis*, 40 F.4th 895, 899 (8th Cir. 2022) (citing *Wesby*, 583 U.S. at 63). "While we are not to define the issue 'at a high level of generality,' *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), '[a] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'" *Nieters v. Holtan*, 83 F.4th 1099, 1109 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 1349 (2024) (citations omitted). In February 2018, it was clearly established "that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Thurairajah*, 925 F.3d at 984 (citations omitted).

The Officers argue they had arguable probable cause to believe the Evanses wore tactical vests to school "with the purpose to communicate a threat at school in a way that would cause alarm and/or disrupt a lawful assembly," in violation of sections 5-71-207(a)(1) and (a)(4). Officers argue that the Evanses' attire alone disrupted a lawful assembly and support their contention by citing *McIntosh*, where we found the defendant's attire contributed to a disorderly conduct violation. *McIntosh v. Ark. Republican Party-Frank White Election Comm.*, 856 F.2d 1185, 1186 (8th Cir. 1988). But there, we found that the officers' decision to arrest the plaintiff rested on more than just the defendant's "outlandish and comical dress." *Id.* Indeed, in *McIntosh*, the defendant had attempted to interrupt a private fundraising banquet attended by then–Vice President George H.W. Bush. *Id.* We determined that the officers had probable cause to believe that the defendant was about to engage in disorderly conduct because he openly "intended to disrupt the banquet, refused to heed the officers' warning, and was attracting attention and creating a disturbance by his dress, his agitation, and his raised voice." *Id.* at 1187. Similar facts are absent here. The Evanses did not disrupt class, and they did not disrupt passing period. They politely and respectfully followed the Officers' instructions. They did not raise their voices and did not create a disturbance through their dress. Moreover, their dress did not violate the Cabot High School dress code, and the school had previously allowed other students to wear tactical vests.

The Officers also allege they had arguable probable cause to believe the Evanses engaged in threatening behavior. Although the Officers do not expressly allege what threatening behavior the Evanses engaged in, we can presume that the threatening behavior was wearing a tactical-style vest on a day that Cabot High School was screening a school shooter training video. Cases show that threatening physical behavior constitutes disorderly conduct. For example, one court found that a patient who "engage[d] in the conduct of hitting the nurse and threatening her and the doctor's lives to create public inconvenience, annoyance or alarm" violated the Arkansas disorderly conduct statute. *M.T. v. State*, 350 S.W.3d 792, 796 (Ark. 2009). Likewise, another court concluded that "erratic behavior, cursing, flailing . . . arms,

and [a violent] demeanor" may amount to threatening behavior. *Johnson v. State*, 37 S.W.3d 191, 195 (Ark. 2001).

By contrast, another court denied qualified immunity on a motion for summary judgment where an officer arrested a Walmart customer he believed was engaging in, or about to engage in, threatening disorderly conduct. *Tanner v. Ziegenhorn*, No. 4:17-CV-780, 2020 WL 5648642, at *2 (E.D. Ark. Sept. 22, 2020). The officer claimed that he believed the customer "was becoming unruly in violation of Arkansas's disorderly conduct statute, including raising his voice to a level where he attracted people's attention, stiffening his posture, and bowing up like he might be confrontational." *Id.* The customer, on the other hand, argued that, even though he refused to provide the officer with identification, he was responsive to the officer's questioning, "stayed relatively still[,] and wasn't loud or obnoxious." *Id.* Based on the parties' conflicting accounts, the district court concluded that a jury needed to decide whether the customer "was becoming disorderly." *Id.*

Comparing the undisputed facts here with *Tanner*, the Evanses were cooperative, quiet, and polite. The only evidence the Officers present as threatening are the vests that the brothers wore. Furthermore, the Officers' own actions undermine their argument that the Evanses engaged in threatening behavior. After searching Kameron, the Officers permitted him to walk unrestrained on their way to Principal Hawkins' office and likewise sit outside of Principal Hawkins' office while they met inside. The Officers even considered allowing Kameron to continue wearing or carrying his vest and duffle bag throughout the remainder of the day. For Noah, there is even less support he engaged in threatening behavior. In fact, the Officers present no evidence that Noah acted threatening in any way.

Finally, the Officers do not argue they made a contemporaneous determination that probable cause was established at the time of the arrests. By their own testimony, they made the arrest at the direction of Principal Hawkins. Taking the evidence in the light most favorable to the Evanses, Principal Hawkins' concern

-13-

was not about disruption caused by wearing the vests, but rather Kameron's support of Colin Kaepernick and the Black Lives Matter movement.

In today's climate of school shootings, school officials and police officers are justified in having heightened concern around attire that might suggest a student is armed. But context matters, and schools have many mechanisms to discipline students. Cabot High School, where the Officers work, is a place that had previously tolerated students wearing military gear, without discipline. After searches of the Evanses revealed they were not armed or in any way threatening, the Officers nonetheless decided to arrest both brothers *at the direction of the school principal.* These facts, viewed in the light most favorable to the Evanses, do not support a finding of arguable probable cause. Accordingly, because the district court did not err in denying the Officers' motion for summary judgment and qualified immunity on the Evanses' unlawful arrest claim, we affirm.[3]

## III.

The Officers also argue that the district court erred in denying qualified immunity on the Evanses' malicious prosecution and false imprisonment claims. However, the Officers' only argument supporting this position is that they had probable cause, which would necessarily defeat both claims. As we just concluded, the Officers lacked even arguable probable cause and therefore must lose this challenge. Accordingly, we affirm the district court's denial of summary judgment and qualified immunity as to these claims.

---

[3]The Officers also argue that the undisputed facts show that only Officer Taunton arrested Noah and Kameron, and therefore Officer Dodd is independently entitled to qualified immunity because he did not participate in the arrest. However, whether Officer Dodd took part in the arrest turns on disputed facts. Accordingly, the Court lacks jurisdiction over this issue. *Thompson*, 800 F.3d at 982–83.

-14-

## IV.

Lastly, the Officers contend that the district court erred in denying them qualified immunity on the Evanses' excessive force and abuse of process claims. The Evanses failed to respond to the Officers' arguments on these issues as required by the Federal Rules of Appellate Procedure. Fed. R. App. P. 28(b); *United States v. Stuckey*, 255 F.3d 528, 531 (8th Cir. 2001) ("[W]e regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities."); *see also Harlow v. United States*, 720 F. App'x 805, 807 (8th Cir. 2018) (unpublished) (refusing to consider issues where appellee failed to respond to the appellant's arguments). *United States v. Beasley*, 102 F.3d 1440, 1447 (8th Cir. 1996) ("[A] litigant cannot make arguments on appeal by incorporating by reference into his appellate brief arguments made in written submissions to the trial court."). Accordingly, the Evanses "waived any right to have these arguments considered on appeal." *Toney v. Gammon*, 79 F.3d 693, 696 n.1 (8th Cir. 1996). We do not believe the above-cited cases strictly bind our panel in deciding how to treat the unbriefed issues. But in this instance, because the Evanses failed to respond to these issues on appeal and because we independently determine that these claims have little or no merit, we find it appropriate to reverse the district court's denial of qualified immunity as to the excessive force and state law claims.

## V.

For the foregoing reasons, the district court's judgment is affirmed in part and reversed in part. We remand for further proceedings consistent with this opinion.

KOBES, Circuit Judge, concurring in part and concurring in the judgment.

I agree with the court that the officers are entitled to qualified immunity on excessive force and Arkansas abuse of process, but I would not rely on waiver. Although the arguments on appeal are sparse, the merits are straightforward.  The Evanses can't show that it was clearly established as of February 2018 that any force

-15-

is excessive during an unlawful arrest, as the district court held here, or that the use of handcuffs was objectively unreasonable. *Cf. Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (plaintiff must show "something more" than "some irritation, minor injury, or discomfort where the handcuffs are applied" for it to amount to excessive force (citation omitted)). Nor have they even alleged that the Officers "did anything *after* charges were filed . . . to extort or coerce [them]"—the test for abuse of process under Arkansas law. *Sundeen v. Kroger*, 133 S.W.3d 393, 399 (Ark. 2003) (emphasis added). So both officers are entitled to qualified immunity on excessive force and abuse of process.

I otherwise concur in the court's opinion.

_____