KETHLEDGE, Circuit Judge.
Doyle Jackson collided violently with a dumpster while running from two police officers. Although he was hurt too badly to stand up on his own, the officers left Jackson in the back seat of a patrol car for 40 minutes before taking him to jail. Jackson died of internal bleeding a few hours later.
Jackson’s Estate brought suit under § 1983, alleging that the officers used excessive force during the arrest and that various defendants were deliberately indifferent to Jackson’s medical needs. The defendants moved for summary judgment on qualified-immunity grounds, which the district court granted. We affirm in part, reverse in part, and remand.
I.
Ordinarily, we view the facts in the light most favorable to the nonmoving party. Green v. Throckmorton, 681 F.3d 853, 859 (6th Cir.2012). But here, we have several videos that, taken together, capture most of the events in question. We therefore view the facts in the light most favorable to Jackson’s Estate, unless these videos contradict the Estate’s allegations. See id.
At 4:00 a.m. on May 29, 2007, Jackson assaulted his girlfriend, Imogene Wade, and locked her out of her house. Wade ran to a neighbor’s house and called the police. Officer Dustin Blaskie responded first, followed closely by Officer Jim Wilkins. As the officers arrived, they saw Jackson pulling a car out of Wade’s driveway. Blaskie heard Wade yell that Jackson was stealing her car, so he told Wilkins to stop Jackson from escaping. Wilkins pulled his car forward to block Jackson’s path, but Jackson drove around him and sped off.
A brief ear chase followed. After less than a minute, Jackson’s vehicle crashed into a curb (totaling Wade’s car in the process), and stopped in a field. Both Jackson and Wilkins then exited their vehicles. Wilkins drew his gun, pointed it at Jackson, and ordered him to get on the ground. Jackson ignored him. Instead, *315 Jackson put his hands in the air and walked directly toward Wilkins. When Jackson was less than a step away, Wilkins stiff-armed him. Jackson stumbled backward, then turned and fled down the street.
With Blaskie and Wilkins on his heels, Jackson veered into an alley. Moments later, Blaskie pulled out his taser and shot Jackson in the back. According to the Estate’s experts, the electric shock threw Jackson forward and slammed him into the metal arm of a nearby dumpster. None of the videos depict the arm itself, and none of the witnesses describe it. But the arm was thin enough, and protruded far enough, for Blaskie to say that Jackson did a “backflip” around it.
Jackson tried to get up and continue running after the collision, but the officers quickly caught him. For the next minute or two, Blaskie and Wilkins struggled to subdue Jackson. During that time, they punched, kicked, and tased him repeatedly. At first these actions had little effect on Jackson, but eventually he stopped resisting. The officers then handcuffed Jackson, left him lying on his stomach, and waited for backup.
Officer Preston Alsup, the shift commander, soon pulled up in his patrol car. As his in-car video shows, the three officers ordered Jackson to stand up. Jackson replied that he could not do so on his own. The officers ignored this reply and told him again to stand up. Jackson insisted that he could not. When the officers continued to ignore his request, Jackson pleaded with them:
Please, help me. Please, Lord. Please, help me, Jesus. I cannot stand. I cannot stand. Oh, Lord, help me. Jesus, help me. Help me, please. Help me. Help. Help me. Oh, Lord. Oh.
At that point, Blaskie and Wilkins picked Jackson up and laid him across the back seat of Alsup’s car. As they did so, both officers noticed a bruise forming on Jackson’s chest (he had lost his shirt during the chase), which they concluded had come from his collision with the dumpster.
Alsup, Blaskie, and Wilkins drove separately back to the scene of Jackson’s car accident, where they joined an unidentified fourth officer. For the next 15 minutes or so, Jackson remained in Alsup’s car as the four officers searched the area. They did not monitor Jackson. Then, at 4:40 a.m., Blaskie returned to his car and went back on patrol.
After Blaskie left, Alsup and Wilkins spent another 20 minutes at the accident scene with Jackson. It is unclear what the officers did during this time, though at some point they carried Jackson from Als-up’s car to Wilkins’s. They also discussed whether to take Jackson to the hospital. Although Alsup was responsible for making that decision, Wilkins did not tell him about Jackson’s collision with the dumpster arm. Alsup ultimately decided that Jackson did not need to go to the hospital, so he told Wilkins to take Jackson to jail. All told, Jackson remained at the accident scene for approximately 40 minutes.
Wilkins and Jackson arrived at Berrien County Jail at 5:06 a.m. Four officers were present when they arrived: Ronald Urick, Jason Urick, Brian Wilkey, and Perry Bundy (the “Berrien County officers”). Wilkins told one of these officers that Jackson “had been tased and that he had some injuries.” He did not tell anyone, however, that Jackson had collided with the dumpster arm. The Berrien County officers ordered Jackson out of the car, but Jackson again replied that he could not get up on his own. So the officers pulled Jackson out of the car, and carried him to a cell. As they did, Wilkins noticed that *316 Jackson had defecated on himself. Wilkins then left.
For the next hour, officers monitored Jackson in his cell. Jackson spent most of that time rolling around on the floor, though he did manage to pull himself onto the toilet three times. Jackson continued to defecate on himself, and also vomited. At 6:13 a.m., Berrien County Nurse Mark Haueisen entered Jackson’s cell to perform a medical assessment. Haueisen quickly realized that Jackson was becoming less responsive, so he called an ambulance. Jackson died at the hospital shortly thereafter. An autopsy revealed that the cause of death was internal bleeding from a lacerated liver, which Jackson had suffered during his collision with the dumpster.
Jackson’s Estate then sued everyone involved under § 1983. The Estate alleged two constitutional violations: first, that Blaskie and Wilkins used excessive force when they arrested Jackson; and second, that Alsup, Blaskie, Wilkins, the Berrien County officers, and Haueisen were deliberately indifferent to Jackson’s medical needs after the application of that force. The Estate also sought to establish municipal liability against the City of Benton Harbor, Police Chief A1 Mingo, Berrien County, and Sheriff L. Paul Bailey. The district court granted summary judgment on qualified-immunity grounds to all the defendants. This appeal followed.
II.
We review de novo the district court’s grant of qualified immunity. King v. Taylor, 694 F.3d 650, 661 (6th Cir.2012). Jackson’s Estate has the burden of proving that the defendants should not receive qualified immunity. See Austin v. Redford Twp. Police Dep’t, 690 F.3d 490, 496 (6th Cir.2012). To do so, the Estate must show that the defendants violated Jackson’s constitutional rights, and that those rights were clearly established. See id.
A.
The Estate argues that Blaskie and Wilkins used excessive force when they arrested Jackson. The Fourth Amendment permits an officer to use a reasonable amount of force when making an arrest. See Hayden v. Green, 640 F.3d 150, 153 (6th Cir.2011). To determine whether an officer’s use of force was reasonable, we consider three factors: “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. (quotation marks omitted).
All three factors support the force that the officers used here. First, Jackson had apparently (and in fact) committed several serious crimes, including domestic assault, auto theft, and resisting arrest. Second, he fled from the officers twice: once in Wade’s car and once on foot. Third, the officers had plenty of reason to think that Jackson “pose[d] an immediate threat to the safety of the officers or others[.]” Id. The officers knew that Wade had reported Jackson for domestic violence. They knew that Jackson had led them on a high-speed car chase, albeit a brief one. And they knew that, after totaling Wade’s car, Jackson had ignored Wilkins’s commands to get on the ground and walked directly at Wilkins instead. The officers’ decision to use force was therefore reasonable.
The Estate disputes this conclusion in two ways. First, it contends that Blaskie violated “TASER rules and procedures” when he allegedly tased Jackson while Jackson was running. The Estate has not cited any cases, however, that say that *317 tasing a running suspect is an excessive use of force. So it has not shown that Blaskie violated clearly established law. Cf. Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir.2012) (holding that, in May 2007, the use of a taser was not a violation of clearly established law).
Second, the Estate contends that the officers used too much force after Jackson’s collision with the dumpster arm, when they allegedly tased him 11 times, as well as punched and kicked him repeatedly. The Estate concedes, however, that Jackson was the “strongest” and the “most physical” person the officers had ever fought. So the officers had to use a significant amount of force to subdue him. Moreover, we give a “measure of deference to the officer’s on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.” Green, 640 F.3d at 153 (quotation marks omitted). And the officers used less force here than we have found reasonable elsewhere. For example, in Williams v. Sandel, 433 Fed.Appx. 353, 362 (6th Cir.2011), we held that it was reasonable for officers to tase a suspect 37 times, in addition to using their batons and pepper spray, because the suspect “remained unsecured and unwilling to comply with the officers’ attempts to secure him[.]” Id. Blaskie and Wilkins acted similarly — they stopped applying force the moment Jackson stopped resisting them.
In sum, Jackson’s Estate cannot prove to a jury that Blaskie and Wilkins used excessive force during the arrest, or that they violated clearly established law. They are therefore entitled to qualified immunity.
B.
The Estate also argues that Alsup, Bla-skie, Wilkins, the Berrien County officers, and Haueisen were deliberately indifferent to Jackson’s medical needs after the arrest. Under the Fourteenth Amendment, pretrial detainees have a right to medical treatment that is analogous to the right of prisoners under the Eighth Amendment. Bruederle v. Louisville Metro Gov’t, 687 F.3d 771, 776 (6th Cir.2012). To prove a deprivation of that right, the Estate must show that the defendants acted with “deliberate indifference to serious medical needs.” Harris v. City of Circleville, 583 F.3d 356, 367 (6th Cir.2009) (quotation marks omitted).
Undoubtedly, Jackson had a serious medical need: an internal liver laceration that caused his death. The issue, therefore, is whether the defendants acted with “deliberate indifference” to that need. To show that the officers acted with deliberate indifference, the Estate must “allege facts which, if true, would show that the [officers] subjectively perceived facts from which to infer substantial risk to [Jackson], that [the officers] did in fact draw the inference, and that [the officers] then disregarded that risk.” Id. at 368 (quotation marks omitted). As for a defendant’s subjective knowledge, “a factfinder may conclude that a [defendant] knew of a substantial risk from the very fact that the risk was obvious.” Id. (quotation marks omitted). We analyze separately the allegations against each defendant. See Reilly v. Vadlamudi, 680 F.3d 617, 624 (6th Cir.2012).
1.
We start by applying the three elements of the deliberate-indifference test to Officer Wilkins. First, a jury could conclude that he “subjectively perceived facts from which to infer substantial risk to [Jackson.]” The Estate says that Wilkins perceived two events that could have injured Jackson: the collision with the *318 dumpster arm and the fight with the officers that followed. Wilkins then perceived several facts that suggested an injury had actually occurred: Wilkins heard Jackson say repeatedly that he could not stand up; and he heard Jackson’s moans for help. Even though it was dark, and even though Jackson was African-American, Wilkins could see that Jackson had a rapidly forming chest bruise from his collision with the dumpster arm. Wilkins also saw Jackson’s rapid physical deterioration — in only a few minutes, Jackson went from someone who could run from the police and resist repeated punches, kicks, and electric shocks, to someone who could not walk, sit, or stand up on his own.
Wilkins disputes that he actually saw Jackson’s collision with the dumpster arm. But the in-car video shows that Wilkins was close behind Blaskie as the officers entered the alley, and Blaskie admits to seeing the collision. Thus, a reasonable jury could infer that Wilkins saw the collision as well. See Green, 681 F.3d at 859.
Second, a jury could also conclude that Wilkins in fact drew the inference that Jackson was at a substantial risk of serious harm. Wilkins admitted in his deposition that he knew Jackson was injured: indeed, he and Alsup discussed whether Jackson needed to go to the hospital. The only question, therefore, is whether Wilkins knew that there was a substantial risk that Jackson was seriously hurt. And here, a reasonable jury could conclude that he did. Wilkins allegedly saw Jackson’s collision with the dumpster arm, which was violent — so violent, in fact, that it caused Jackson to do a back flip around it. More importantly, Jackson’s repeated statements that he could not stand up and his pleas of “Jesus, help me. Help me, please” made clear that he was in serious pain. Likewise, his unusually rapid physical deterioration suggested injury. Blaskie and Wilkins described Jackson as the “strongest” and “most physical” person they had ever fought; yet, in the span of a few minutes, he became nearly helpless.
In response, Wilkins argues that Jackson’s superficial injuries — the bruise and a few scrapes — were not serious enough to signal a substantial risk of serious harm. Although true, this argument ignores more serious facts — the violent collision with the dumpster, the rapid change in Jackson’s condition, his pleas for help — that suggested an internal injury. Wilkins also argues that Jackson simply appeared intoxicated, rather than seriously injured. That explanation rings hollow: Although Jackson was intoxicated, Officer Wilkins knew firsthand that he had been able to run and fight with the officers only moments before. Had Jackson been so drunk that he could not stand up, he would not have been able to do any of these things. Finally, Wilkins alleges that the officers offered to take Jackson to the hospital, and that Jackson refused. But the Estate denies that allegation, and — despite Wilkins’s unequivocal statement that the in-car video records such an offer — the video in fact does not. The video did record Officer Alsup asking Jackson whether he felt alright, to which Jackson allegedly responded, “Yeah, I feel okay.” Jackson’s voice is unintelligible in that recording, however, and there is no evidence that Wilkins even heard this brief exchange. Thus, “a jury would be entitled to discount [Wilkins’s] explanation.” Estate of Carter v. City of Detroit, 408 F.3d 305, 313 (6th Cir.2005).
Third, a jury could conclude that Wilkins disregarded the risk of harm to Jackson. After returning to the accident scene, Wilkins allegedly allowed Jackson to lie in the back of Alsup’s car for 40 minutes without trying to help him. Moreover, there is no evidence in the record explaining the delay. There were three other officers on *319 the scene, so Wilkins did not need to help with the search of Wade’s car. And even if he had, both the jail and the hospital were only a few minutes away. Thus, Wilkins could have taken Jackson to either location, and returned to the scene in minutes.
Wilkins also appeared to violate Benton Harbor policy during the long delay. See Harris, 588 F.3d at 369 (holding that the failure to follow “stated jail policy” supported a finding of deliberate indifference). Benton Harbor Police Department General Order 3 provides: “Officers using force on a subject shall make immediate medical treatment available to that subject when ... the subject complains of injury or continued pain ... [or] any officer observes or suspects injury to the subject[.]” (Emphasis in original.) Here, it was clear that Jackson was in pain, and that Wilkins saw him get injured. But Wilkins did not “make immediate medical treatment available” to Jackson. General Order 3 also provides that “[a]ny subject upon whom force is used should be monitored closely[.]” None of the officers monitored Jackson while they searched the accident scene. Finally, General Order 3 provides that “[p]ersons exhibiting signs of unusual distress should be immediately transported to a medical facility for treatment.” Jackson exhibited signs of unusual distress, such as the inability to stand without help. Wilkins did not, however, transport him immediately to a medical facility.
Wilkins also failed to tell Alsup about Jackson’s collision with the dumpster arm. Wilkins knew that Alsup, as the shift commander, had the final authority to decide whether Jackson should go to the hospital. Despite that knowledge, Wilkins did not tell Alsup what he had seen. This failure to pass on important information about Jackson’s injury also supports a finding of deliberate indifference. See Estate of Carter, 408 F.3d at 313.
Wilkins then repeated this mistake at the Berrien County Jail. When he arrived, Wilkins told the officers only that Jackson “had been tased and that he had some injuries.” Even after seeing that Jackson had defecated on himself, he said nothing about Jackson’s collision with the dumpster arm. That mistake proved costly: Nurse Haueisen later stated that, had Wilkins passed this information on, Haueisen would have sent Jackson directly to the emergency room.
In light of these alleged facts, a reasonable jury could conclude that Wilkins “subjectively perceived facts from which to infer substantial risk to [Jackson], that [he] did in fact draw the inference, and that [he] then disregarded that risk.” See Harris, 583 F.3d at 368. The Estate has therefore made out a potential violation of Jackson’s constitutional rights. The Estate can also show that Jackson’s right to adequate medical care was clearly established at the time of the injury. See Estate of Carter, 408 F.3d at 313. Wilkins is not entitled to qualified immunity.
2.
We next turn to Officer Blaskie. He was similarly situated to Wilkins in many ways: he saw Jackson’s collision with the dumpster arm, he heard Jackson’s moans of pain, he saw Jackson’s physical deterioration, and he did nothing to help him. But Blaskie differs from Wilkins in two respects. First, Blaskie spent much less time with Jackson than Wilkins did. After returning to the accident scene, Blaskie helped search the area for 15 minutes or so. He then returned to his patrol, leaving Jackson in Alsup’s and Wilkins’s hands. Second, Blaskie did not participate in the conversation with Alsup about whether to take Jackson to the hos *320 pital, or in the conversation with the officers at Berrien County Jail. Blaskie did not, therefore, have the same obligation to pass on his knowledge about Jackson’s collision. Under these circumstances, a reasonable jury could not find that Blaskie showed deliberate indifference to Jackson’s serious medical needs, largely because he had much less opportunity to. Thus, Blaskie was entitled to qualified immunity.
3.
Officer Alsup presents an easier case. He was not present when Jackson collided with the dumpster arm, and neither Blaskie nor Wilkins told him about that collision. Also, Alsup did not see Jackson before the collision, so he did not know that Jackson’s behavior had changed so drastically. To Alsup, Jackson simply “looked and acted no differently than any other arrestee who fled, resisted arrest and fought with police.” Jackson’s Estate has not shown, therefore, that a jury could find Alsup actually drew the inference that Jackson was at a substantial risk of serious harm. The district court properly granted him qualified immunity.
4.
The four Berrien County officers— Ronald Urick, Jason Urick, Brian Wilkey, and Perry Bundy—also present an easy case. When Wilkins came into the jail, he did not tell the officers that Jackson had collided violently with a dumpster arm. Given that Jackson’s injury was an internal one, these officers had little reason to believe that Jackson might be seriously injured. In response, Jackson’s Estate points to several facts: that Jackson was unable to walk on his own, that he had trouble communicating, that he had defecated on himself, and that he vomited in his cell. As Officer Bundy explained, however, these behaviors simply made Jackson “appear[] to be extremely intoxicated.” Thus, the Estate cannot prove that the Berrien County officers knew a substantial risk of serious harm existed. These officers were entitled to qualified immunity.
5.
The same analysis applies to Nurse Haueisen, with one exception. Based on a report that Haueisen wrote, the Estate alleges that Haueisen realized that Jackson needed to go to the hospital at 5:40 a.m. The Estate also alleges that Haueisen did not call an ambulance until 6:22 a.m., based on the jail’s video of Jackson’s cell. This half-hour delay, the Estate argues, proves that Haueisen was deliberately indifferent to Jackson’s medical needs.
This argument seriously distorts the record. The Estate concedes that Haueisen only realized that Jackson needed to go to the hospital after he entered Jackson’s cell to perform a medical assessment. The jail’s video shows that Haueisen entered Jackson’s cell to perform that assessment at 6:13 a.m., and that same video shows that Haueisen called an ambulance approximately ten minutes later. In response, the Estate points to Haueisen’s report, which says that he entered Jackson’s cell at 5:40 a.m. But that same report likewise says that he called an ambulance ten minutes later. What the Estate seeks to do, therefore, is use the (probably mistaken) time entry on the report for the time of the assessment, and then use the (much later) video time to determine when Haueisen called the ambulance. The Estate cannot do so: The video makes clear that Haueisen called an ambulance ten minutes after the assessment. And the video shows that Haueisen wrote down the wrong time on the report. Thus, we must view the facts “in the light depicted by the videotape.” Green, 681 F.3d at 859 (quota *321 tion marks omitted). This dispute, therefore, does not present a genuine issue of material fact, and the district court correctly granted qualified immunity to Haueisen.
C.
Finally, Jackson’s Estate asserts municipal-liability claims against the City of Benton Harbor and Berrien County. (The Estate also asserts claims against Police Chief A1 Mingo and Sheriff L. Paul Bailey in their official capacities. We do not need to discuss these claims separately, however, because “individuals sued in their official capacities stand in the shoes of the entity they represent.” Alkire v. Irving, 330 F.3d 802, 810 (6th Cir.2003).) To establish municipal liability, the Estate must prove that “[Jackson’s] constitutional rights were violated and that a policy or custom of the municipality was the moving force behind the deprivation of the plaintiffs rights.” Miller v. Sanilac Cnty., 606 F.3d 240, 254-55 (6th Cir.2010) (quotation marks omitted).
1.
We first turn to the claim against Benton Harbor. The Estate argues that Benton Harbor is liable for Officer Wilkins’s alleged constitutional violation because the City has a policy of inadequately training its officers. To prevail on this claim, the Estate must prove that Benton Harbor’s failure to train “amounts to deliberate indifference to the rights of persons with whom the police come into contact.” Id. at 255 (quotation marks and emphasis omitted). And to prove deliberate indifference, the Estate must point to “prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse[.]” Id.
The Estate contends that the City was deliberately indifferent to the rights of its citizens when it failed to train its officers on Benton Harbor Police Department General Order 9. That order states in relevant part that, whenever an officer uses a taser on a suspect, the officer should take that suspect “to a medical facility for clearance prior to transport to the nearest detention facility or other institution.” Had the City trained its officers on General Order 9, the Estate says, Officer Wilkins would have taken Jackson to the hospital, and Jackson would have lived. The problem with this argument is that the City had not formally adopted that order at the time of Jackson’s death. And a municipality cannot “fail to train” its officers on a policy that did not exist. The Estate’s real complaint, therefore, is that the City had not adopted General Order 9. But “the fact that alternative procedures might have better addressed [Jackson’s] particular needs does not show that the [City] was deliberately indifferent[.]” Graham ex rel. Estate of Graham v. Cnty. of Washtenaw, 358 F.3d 377, 384 (6th Cir.2004) (alterations and quotation marks omitted).
The Estate also contends that Officer Wilkins’s failure to take Jackson to the hospital proves that the City did not train him properly. But the Estate must point to more than “an isolated, one-time event” to prove that the City had a policy of inadequate training. See Fox v. Van Oosterum, 176 F.3d 342, 348 (6th Cir.1999). Instead, it must provide evidence, rather than mere allegation, of “prior instances of unconstitutional conduct.” Miller, 606 F.3d at 255. And the Estate has not done so.
As an alternative basis for liability, the Estate argues that Benton Harbor had a policy of failing to discipline its officers for their constitutional violations. Like the failure-to-train claim, however, the Estate must show that Benton Har *322 bor’s failure to discipline amounts to “deliberate indifference.” See Berry v. City of Detroit, 25 F.3d 1342, 1354 (6th Cir.1994). In its attempt to make that showing, the Estate cites only one alleged failure to discipline: the case before us. One example of the City’s failure to discipline, however, does not prove that the City had a policy of failing to discipline. See id. at 1355. So the district court correctly rejected this argument.
2.
As for the claim against Berrien County, the Estate cannot show that any of the County’s agents violated Jackson’s constitutional rights. Thus, the County itself cannot be held liable under § 1983. See Williams v. City of Grosse Pointe Park, 496 F.3d 482, 488 (6th Cir.2007).
The district court’s judgment is affirmed, except that its grant of summary judgment to Officer Wilkins is reversed. The case is remanded for further proceedings consistent with this opinion.