# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-2872
_____

Clayton Stewart

*Plaintiff - Appellant*

v.

Victor Garcia, Individually and in his Official Capacity as a Police Officer in and for the City of Jonesboro, Arkansas; Rick Elliott, Individually and in his Official Capacity as Chief of Police for the Jonesboro Police Department (originally named as Rick Elliot); City of Jonesboro, Arkansas; John Doe, 1–10

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Northern
_____

Submitted: April 10, 2024
Filed: June 5, 2025
_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.
_____

KELLY, Circuit Judge.

This case arises out of a police officer's tasing of a man who was climbing a fence. Victor Garcia, an officer with the Jonesboro, Arkansas, police department, suspected Clayton Stewart of causing a domestic disturbance. Garcia approached Stewart, who began running away, and a chase ensued. When Stewart started

climbing a fence, Garcia tased him. Stewart fell over the fence and is now paralyzed. Stewart later brought this 42 U.S.C. § 1983 action, asserting that Garcia, Jonesboro Chief of Police Rick Elliot, and the City of Jonesboro violated his Fourth and Fourteenth Amendment rights. The district court[1] granted summary judgment to defendants on all claims. Stewart appeals. After careful review, we affirm.

## I.

On April 21, 2018, Garcia responded to a domestic disturbance call shortly after midnight. Garcia was advised by dispatch that a 911 caller had reported that "a guy is beating up a female inside [apartment] D." Dispatch advised Garcia that the apartment building was located on the 900 block of Melrose Street, and Garcia began driving in that direction. As he was driving along the 400 block of Melrose, Garcia came upon two men—later identified as Stewart and John Bedford Russell— fighting. Garcia recalled that they were "not throwing punches," but were "chasing each other," "struggling" and "wrestling." As Garcia approached the men, Stewart ran. Garcia ran after him, repeatedly commanding Stewart to stop, and warning he would otherwise be tased. Garcia did not activate his body camera.

Still running, Stewart started to climb what looked like a standard, six-foot tall "privacy fence." However, the fence was higher off the ground—between eight-and-a-half and nine feet—on the other side due to a slope. At some point while Stewart was climbing the fence, Garcia tased him. It is undisputed that, after he was tased, Stewart fell over the fence, landing on the other side. The parties dispute whether the taser caused his fall. Specifically, they disagree about whether the taser prongs lodged deeply enough into Stewart to stun him and how high he was on the fence at the time of the tasing. After Stewart fell, Garcia jumped over the fence himself.

---

[1]The Honorable D.P. Marshall Jr., United States District Judge for the Eastern District of Arkansas.

Sometime thereafter, Garcia turned on his body camera. The body camera video begins with Stewart lying face down on the ground, handcuffed, with his legs pressed together.[2] Garcia dislodged the taser prongs, and said, "I'm going to roll you and get you up, alright?" Garcia then attempted to roll Stewart over, and told him, "Roll over, roll over." When Stewart did not roll over on his own, Garcia told him to "quit acting." Stewart responded, "I'm not." Garcia then tried to pull Stewart to a standing position, saying, "Stand up. Stand up!" Stewart moaned and said, "My back hurts, I'm sorry." Stewart continued to apologize to Garcia and said, "Please help me." Garcia again tried to pull Stewart up, and Stewart, in a louder voice this time, said, "Ow, it hurts, it hurts!" Garcia asked Stewart if he needed "an ambulance to come check [him] out." Stewart moaned loudly. Garcia then assured Stewart that, "either way," he would be "going to jail" and again told him to "quit acting." Stewart, moaning louder, said, "I'm not acting, sir, I promise." Garcia again asked Stewart whether he needed an ambulance and Stewart continued to moan, before saying, "No, sir."

Stewart did not get up on his own, and continued to moan as Garcia repeatedly commanded, "Stand up!" Stewart said he was trying, and Garcia said, "You're not trying, quit acting." Stewart responded, saying, "I can't feel," "I really can't feel," and "I'm sorry, sir." Then, as Garcia attempted to push Stewart into a sitting position with his legs stretched out in front of him, Stewart moaned louder and said, "It hurts! It hurts!" Garcia radioed for an ambulance and left Stewart on the ground. Stewart continued to apologize for not complying with Garcia's orders, saying, "Sorry, sir. I'm sorry, sir. I cannot feel."

Officer Christopher Pigg arrived on the scene. Pigg approached Garcia, who summarized Stewart's condition: "He says he cannot feel his legs, and it hurts." Garcia then reminded Stewart again, "Either way, you're going to jail." Pigg asked Stewart his name and age. When Stewart said he was 25 years old, Pigg responded, "then let's act like it." Stewart told Pigg he could not feel his legs because he got

---

[2]The first thirty seconds of the video do not contain audio.

"shot," and Garcia corrected him: "You got tased . . . I told you to stop." Pigg then asked Garcia, "You want to put him in the car or leave him here?" Garcia responded, "We got EMS coming," and then stated, "we can put him in the car." Pigg and Garcia grabbed Stewart's handcuffed arms and told him to "get up," "use your feet," and "quit acting." Garcia said, "I'm going to drag you either way." Pigg and Garcia then pulled Stewart across the lawn and leaned Stewart's body against the side of the patrol car door.

Soon, Stewart's girlfriend, Brittany Meyer, arrived. She became visibly upset when she saw Stewart, crying and reaching out to him. Pigg held her back, saying "Ma'am, he is hurt. He needs to go to the hospital." Meyer grabbed at Stewart's body, and the officers instructed her to "let him go." Pigg said, "Let him go so he can go to the hospital." Meyer calmed down, and Pigg opened the rear door of the patrol car. Pigg said to Stewart, "Are you going to stand up and get in that car, or am I going to have to throw you in there?" Stewart did not move, saying, "I need help, please." Pigg and Garcia tried to stand him up again, telling Stewart, "Use your feet." and "Quit acting." Stewart asked if he could try to move on his own, but concluded, "I can't use them, I really can't use them." Garcia and Pigg then laid Stewart back down on the ground, on his back. Stewart continued to moan, repeating "I'm trying, really, I'm trying," while the officers talked about the events leading up to the tasing.

An ambulance arrived a few minutes later. Garcia provided the following synopsis to the EMTs, before they examined Stewart:

> He took off running, so I chased him, and he was fixin' to climb the fence, and I tased him. And, I mean, he fell, but now he's claimin' that he can't get up, that he can't feel his legs. I don't know if it's true or not . . . I know he thinks by acting that he's hurt he's not going to jail, but he's going to jail no matter what.

An EMT walked up to Stewart and started talking to him. Stewart asked if the EMT could get him "out of here." The EMT explained that was not going to happen because Stewart was "his," presumably referring to one of the officers. The EMT

then asked Stewart, "You said you can't feel your legs?" and proceeded to pinch Stewart's toes. The body camera footage does not show what Stewart's response was, if any, to the pinch. Later, the EMT pinched Stewart's toes again and said, "He can feel 'em." Garcia responded, "He's good? Okay."

The officers and the EMTs then discussed who should take Stewart to the hospital. The officers told Stewart to "man up," "stand up," and "walk," as Stewart repeated, "It hurts." Eventually, Garcia and Pigg loaded Stewart into the back of the police car. Stewart was taken to St. Bernards Medical Center in Jonesboro, and later airlifted to Memphis for emergency treatment. Stewart remembers nothing from when Garcia arrived on the scene to the moment of his airlift. He was later diagnosed with traumatic spinal cord injury and is permanently paralyzed from the chest down.

In April 2021, Stewart brought this § 1983 action against Garcia, Elliot, and the City of Jonesboro alleging violations of his Fourth and Fourteenth Amendment rights. As relevant on appeal, Stewart alleged that Garcia arrested him without probable cause, used excessive force by tasing him, and was deliberately indifferent to his medical needs. Stewart further alleged that Elliot was liable for Garcia's misconduct as his supervisor and that the police department's use of force and taser policies were unconstitutional. Defendants jointly moved for summary judgment, and the district court granted the motion in full.

Stewart appeals, arguing that he has raised genuine disputes of material fact that preclude summary judgment on each claim.

II.

We review the district court's grant of summary judgment de novo, drawing all inferences in favor of the non-moving party. Boude v. City of Raymore, 855 F.3d 930, 933 (8th Cir. 2017). This does not extend to factual representations by the non-moving party that are "blatantly contradicted" by video evidence. Scott v. Harris, 550 U.S. 372, 380 (2007); see also Boude, 855 F.3d at 933.

Qualified immunity protects "government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Clinton v. Garrett, 49 F.4th 1132, 1139 (8th Cir. 2022) (quoting Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996)). Accordingly, a qualified immunity inquiry asks whether "(1) [an officer] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." Evans v. Cabot Sch. Dist., 114 F.4th 946, 952 (8th Cir. 2024) (quoting Thurairajah v. City of Fort Smith, 925 F.3d 979, 982 (8th Cir. 2019)). To demonstrate that a right was clearly established, plaintiffs must point to "'controlling authority' or 'a robust consensus of cases of persuasive authority.'" District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741–42 (2011)); see also id. at 64 (recognizing that a "rare 'obvious case[]'" may be sufficient to place conduct "beyond debate," but noting "'a body of relevant case law' is usually necessary" (internal quotations omitted)).

## A.

Stewart first argues that Garcia lacked probable cause to arrest him. "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Gilmore v. City of Minneapolis, 837 F.3d 827, 832 (8th Cir. 2016) (quoting Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011)). "If an officer arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists 'if the mistake is objectively reasonable.'" Id. at 832 (quoting Borgman, 646 F.3d at 523).

Stewart argues that Garcia had no reason to link him to the dispatch call concerning a domestic disturbance inside an apartment because Garcia saw Stewart and Russell outside, fighting in the street several blocks away. But Garcia had at least arguable probable cause to arrest Stewart for misdemeanor assault—based on seeing Stewart's conduct in the street with Russell. See Ark. Code Ann. § 5-13-

207(a) (West 1975) ("A person commits assault in the third degree if he or she purposely creates apprehension of imminent physical injury in another person."). Garcia also had arguable probable cause to arrest Stewart for misdemeanor fleeing because the parties agree that Stewart ran when Garcia approached the two men, despite Garcia's repeated commands to stop. See Ark. Code Ann. § 5-54-125(b) (West 2017) ("Fleeing is a separate offense and is not considered a lesser included offense . . . with relation to other offenses which may occur simultaneously with the fleeing."). The district court did not err in granting summary judgment on this claim.

B.

Next, we turn to Stewart's excessive force claim. In considering whether Stewart has shown a violation of his Fourth Amendment right to be free from excessive force, we ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Lombardo v. City of St. Louis, 594 U.S. 464, 466 (2021) (per curiam) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). We consider such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Westwater v. Church, 60 F.4th 1124, 1128 (8th Cir. 2023) (quoting Graham, 490 U.S. at 396).

Viewing the facts in the light most favorable to Stewart,[3] see Tolan v. Cotton, 572 U.S. 650, 656 (2014) (holding that courts "may not resolve genuine disputes of fact in favor of the party seeking summary judgment"), he was elevated when Garcia

---

[3]Garcia argues that there is "no evidence whatsoever that [he] deployed his Taser when Mr. Stewart was at or near the top of the fence" or "that use of the Taser caused Mr. Stewart to fall off the top of the fence." But Garcia said he knew that "the top of [Stewart's] head was just above the fence" when the taser probes hit him, Stewart fell on the opposite side of the fence after being tased, and the Jonesboro Police Department concluded that Garcia violated its taser policy by using a taser on someone who was "in an elevated position."

tased him, the taser incapacitated him, and, as a result, he fell over the fence without the ability to brace himself. Stewart asserts that this tasing amounted to deadly force and, thus, excessive force on the facts of his case. See Cole Estate of Richards v. Hutchins, 959 F.3d 1127, 1132–33 (8th Cir. 2020) (identifying "considerations particularly relevant [] to guide our assessment of objective reasonableness" in "use-of-deadly-force cases").

To begin, we have recognized that a taser shock generally conveys less-than-deadly force. See Boudoin v. Harsson, 962 F.3d 1034, 1040 (8th Cir. 2020) (resisting "any implication that a single taser shock constitutes 'deadly force'" in case involving a single taser shock to plaintiff who had come to a stop on his motorcycle). But we also appreciate that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Graham, 490 U.S. at 396 (quoting Bell v. Wolfish, 441 U.S. 520, 529 (1979)). And force that is typically non-lethal can rise to the level of deadly force depending on the circumstances. See Scott, 550 U.S. at 375, 384 (noting that an officer "appl[ying] his push bumper to the rear of [the fleeing suspect's] vehicle" during a high-speed chase "posed a high likelihood of serious injury or death to [the fleeing suspect]"); Ludwig v. Anderson, 54 F.3d 465, 473 (8th Cir. 1995) (explaining that questions of fact existed as to whether an officer's decision to apprehend a suspect by hitting him with a squad car travelling 15 miles per hour constituted deadly force).

A taser, used in dart mode,[4] "is designed to incapacitate instantly." McKenney v. Harrison, 635 F.3d 354, 360 (8th Cir. 2011). At least three circuit courts have

---

[4]"In dart mode . . . 'tasers fire metal probes into the skin, penetrating up to half an inch' and 'delivering a 50,000 volt shock that lasts up to five seconds and causes electrical muscular disruption.'" Cravener v. Shuster, 885 F.3d 1135, 1137 n.1 (8th Cir. 2018) (alterations omitted) (quoting McKenney v. Harrison, 635 F.3d 354, 362 (8th Cir. 2011) (Murphy, J., concurring)). A taser used in drive-stun mode, by contrast, is applied "so as to make direct contact with the subject's body," causing "discomfort" but not resulting in incapacitation. Id. (quoting De Boise v. Taser Int'l, Inc., 760 F.3d 892, 895 n.5 (8th Cir. 2014)).

recognized that incapacitating a person who is in a sufficiently elevated position poses "a substantial risk of causing death or serious bodily harm." See e.g., Bradley v. Benton, 10 F.4th 1232, 1241 (11th Cir. 2021) (tasing a person at the top of an eight-foot wall constitutes deadly force because it "create[s] a substantial risk of causing death or serious bodily harm"); Peroza-Benitez v. Smith, 994 F.3d 157, 167–68 (3d Cir. 2021) (employing temporarily paralyzing force on an elevated person "vulnerable to falling from a precarious height" poses "a risk of serious injury or death"); Baker v. Union Twp., 587 F. App'x 229, 234 (6th Cir. 2014) ("It is widely known among law enforcement and was even a subject of [defendant officer's] police training that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall.").[5] And we have recognized that incapacitating someone with a taser when they are elevated is meaningfully different, for purposes of the Fourth Amendment, from tasing a person who is not. See McKenney, 635 F.3d at 360 ("[A] reasonable officer, knowing that a Taser is designed to incapacitate instantly, could have believed that the force would incapacitate [the suspect] before he reached the window, while he was not in an 'elevated position' and likely to fall."). Because a taser incapacitates instantly, using a taser on a person in an elevated position can amount to deadly force.

We need not decide whether Garcia's use of deadly force[6] was objectively reasonable here, however, because Stewart's right to be free from such force was not clearly established in April 2018. See Wesby, 583 U.S. at 63 ("This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))). We have yet to confront a similar factual scenario to the one here, and we have never found a constitutional violation based on similar facts. See Kisela v. Hughes, 584 U.S. 100,

---

[5]As noted, Garcia was found to have violated the Jonesboro Police Department's policies on taser use by tasing someone in an elevated position.

[6]Viewing the facts in the light most favorable to Stewart, Garcia tased him when Stewart faced an eight-to-nine-foot fall.

104 (2018) ("Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam))).

Stewart offers no Eighth Circuit or Supreme Court cases on point, citing instead to other courts that have found excessive force when an officer incapacitates a person who is in an elevated position. But he cites only one case—from an out-of-circuit district court—that pre-dates the incident at issue here. See Martin v. City of Reading, 118 F. Supp. 3d 751, 766 (E.D. Pa. 2015) (using a taser on an elevated suspect can cause serious injury). And the published circuit cases that support Stewart's argument post-date the incident, so they could not have served to put Garcia on notice. See Bradley, 10 F.4th at 1241; Peroza-Benitez, 994 F.3d at 168.[7] In short, Stewart has failed to identify "a robust 'consensus of cases of persuasive authority'" that "placed the constitutionality of [Garcia's] conduct 'beyond debate.'" Wesby, 583 U.S. at 589 (quoting al-Kidd, 563 U.S. at 741); see also Boudoin, 962 F.3d at 1043 (finding no excessive force in tasing a suspect, who then fell from his motorcycle, because he was likely to flee and posed an immediate danger to the public); McKenney, 635 F.3d at 360.

We affirm the district court's entry of summary judgment for Garcia on Stewart's excessive force claim because Garcia is entitled to qualified immunity.

C.

Stewart also appeals the grant of summary judgment on his claim that Garcia was deliberately indifferent to his serious medical need. We analyze this claim under the Fourteenth Amendment's due process clause, see Poemoceah v. Morton County,

---

[7]The Sixth Circuit's opinion in Baker pre-dates the incident, see 587 F. App'x at 234, but it is unpublished and thus "provides little, if any, support for imposing liability based on clearly established law." Blazek v. Iowa City, 761 F.3d 920, 925 n.3 (8th Cir. 2014).

117 F.4th 1049, 1055 (8th Cir. 2024), relying on both Fourteenth and Eighth Amendment cases alike, see Hott v. Hennepin County, 260 F.3d 901, 905 (8th Cir. 2001).

We begin with whether Stewart has demonstrated a constitutional violation. "Deliberate indifference has both an objective and a subjective component. The objective component requires a plaintiff to demonstrate an objectively serious medical need. The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quoting Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009)).

Garcia does not dispute that Stewart's medical need was objectively serious, so we consider only the subjective prong of the test. The subjective component requires the official to have "be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw[n] the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Whether a[n] . . . official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a[n] . . . official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842 (citations omitted); see also Thompson v. King, 730 F.3d 742, 747 (8th Cir. 2013) (same). "In addition . . . officials who actually knew of a substantial risk to [a plaintiff's] health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Garcia's body camera recorded what happened after Stewart fell eight to nine feet, and the video is, as the district court said, "hard to watch." Stewart, face down on the ground, did not move at all when Garcia removed the taser prongs from his body. Nor did Stewart move on his own when Garcia rolled him over and tried to pull him to a standing position. Stewart told Garcia that he could not stand up, was in pain, and could not feel his legs. Throughout their interaction, Stewart repeated,

"it hurts," and moaned in pain. In response, Garcia repeatedly told Stewart to "quit acting" and to "stand up." After Stewart showed no signs of being able to stand on his own, Garcia again tried to forcibly pull him to his feet. Garcia then tried several more times to get Stewart to stand up. Each time Garcia forcibly moved Stewart, Stewart's cries grew louder and more insistent, yet Garcia persisted. When Pigg arrived, Garcia told Stewart he was going to "drag [him] either way," and the two officers pulled Stewart by his arms across the lawn and sat him up against the patrol car. Both officers knew EMS was on its way, and neither articulated any exigency or other reason for moving Stewart before the EMTs arrived. Nor does the record reflect any. When Stewart still could not stand up, the officers tried to push him into the back seat; when Stewart said he wanted to try to get into the police car on his own, he failed. And when Stewart's girlfriend tried to grab onto Stewart, Garcia heard Pigg say, "Ma'am, he is hurt. He needs to go to the hospital." At no time during the encounter was Stewart belligerent or combative; rather, he apologized several times for not being able to do what the officers were asking him to do. The body camera video never shows Stewart moving his legs of his own volition.

A reasonable jury could interpret this conduct,[8] together with Garcia's comments that Stewart would be going to jail "either way," or "no matter what," as

___

[8]To the extent Stewart alleges Garcia intentionally delayed seeking treatment, he has failed to show deliberate indifference. Garcia called EMS within two minutes after Stewart first complained of pain. Similarly, the EMT's determination that Stewart was "okay"—a fact not in dispute—is sufficient to show that Garcia's conduct after the EMTs arrived was objectively reasonable. See Carpenter v. Gage, 686 F.3d 644, 651 (8th Cir. 2012) ("Where the medical professionals . . . never even suggested that treatment was warranted, there is insufficient evidence that a need for medical treatment was so obvious that the sheriff's deputies exhibited deliberate indifference by taking [the plaintiff] to jail." (citation omitted)). The partial concurrence concludes that, since the EMT did not think an injury was "obvious," neither did Garcia. But the EMT's conclusion that Stewart was "okay" is not dispositive of whether Garcia was deliberately indifferent before EMS arrived; unlike Garcia, the EMT did not witness Stewart's fall or subsequent behavior. We also note that because the medical providers who arrived at the scene are not parties to this case, we have no occasion to consider the propriety of their actions.

-12-

evidence that Garcia appreciated the likelihood that Stewart was seriously injured but forcibly moved him anyway. See Thompson, 730 F.3d at 747 ("[I]f a response to a known risk is obviously inadequate, this may lead to an inference that the officer 'recognized the inappropriateness of his conduct.'" (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009))). Garcia counters that he believed Stewart was feigning injury to avoid going to jail. There is evidence to support his position. But viewing the facts in Stewart's favor, there remain genuine disputes of material fact about Garcia's state of mind. A jury could reasonably find that Garcia was aware that Stewart was seriously injured and possibly paralyzed based on the height of the fence Stewart fell from, his apparent inability to move his legs, and his repeated and consistent cries of pain.[9] And by choosing to physically move and manipulate Stewart's body for purposes unrelated to treatment or any other exigency, instead of waiting for EMS, a jury could find that Garcia disregarded the risk that he would cause Stewart unnecessary pain and exacerbate his evidently serious injuries.[10]

---

[9]As the partial concurrence points out, Stewart's injuries were "no[t] external." But this does not mean that the risk of serious injury was not obvious. See, e.g., Jackson v. Wilkins, 517 F. App'x 311, 318–19 (6th Cir. 2013) (concluding that a reasonable jury could find arresting officer saw the events that resulted in internal injuries to arrestee, inferred the possibility of internal injuries, and disregarded that risk, relying in part on fact that arrestee pleaded for help and "went from someone who could run from the police and resist . . . to someone who could not walk, sit, or stand up on his own"). Viewing the facts in the light most favorable to Stewart, he had been running, was able to climb a fence, and then fell eight to nine feet to the ground, after which he was unable to move on his own, pleaded for help, and cried out in pain. A reasonable jury could find that the risk that Stewart had internal injuries was obvious.

[10]The partial concurrence points to Krout, 583 F.3d at 570, in asserting that our case law supports finding no deliberate indifference here. But Krout is distinguishable in meaningful ways. There, police officers injured Krout in the course of an arrest and took him to a jail, depositing him in the entryway. Id. at 561. Corrections officers, who had not seen Krout's injury, dragged him to a cell and left him there, checking on him intermittently and eventually calling EMS. Id. at 561–62. Krout's condition worsened and, in response to his request, officers sought to help him breathe by adjusting his head and neck. Id. at 562. We found no deliberate

Viewing the facts in the light most favorable to Stewart, a reasonable jury could find that Garcia was deliberately indifferent to Stewart's serious medical needs.

Stewart has failed, however, to show that the right he asserts was clearly established in April 2018. He sets out the legal standards for finding deliberate indifference, but he does not point to case law that holds, with the requisite level of specificity, that Garcia's actions were unlawful. See Ashcroft, 563 U.S. at 742 (cautioning courts not to "define clearly established law at a high level of generality"). Even on our own review, we find no case that would have put Garcia on sufficient notice to overcome the defense of qualified immunity. We have held that an officer's failure to seek medical care for an arrestee with an objectively serious medical need may amount to deliberate indifference. See Barton v. Taber, 820 F.3d 958, 964–65 (8th Cir. 2016) (finding officer's "failure to take some action to secure medical care for [arrestee]" who had an "obvious need for prompt medical attention" after collapsing unconscious at the scene of car accident stated a claim for deliberate indifference). But Garcia promptly called EMS, so this case does not present a complete failure to seek medical care.[11] Because we have not encountered

---

indifference because the officers did not ignore Krout's condition and tried to help. Id. at 569–70. We had no cause to examine the corrections officers' actions of pulling Krout into a cell or adjusting his neck because the plaintiff did not allege that either were acts of deliberate indifference. See id. at 568 (challenging as deliberately indifferent officers' failure to assess Krout's condition before placing him in a cell, failing to call EMS earlier, and declining to perform CPR).

Here, however, Garcia took affirmative action that allegedly harmed Stewart further, and there is no evidence that he did so for the purpose of treatment or because of any apparent exigency. Garcia also took these actions after witnessing Stewart's fall. For these reasons, Krout does not resolve this case.

[11]In a case that postdates the events here, we concluded that officers who forced an arrestee "to walk 200 feet to the police van" after telling them that "he thought his hip was broken" did not act with deliberate indifference. Poemoceah, 117 F.4th at 1056. But that was because the arrestee was able to walk on his own and, unlike here, had failed to show that the officers had actual knowledge of his injuries. See id.

a set of facts sufficiently similar to those described here, Garcia would not have been on notice that his conduct—after calling EMS and before the EMTs arrived—amounted to deliberate indifference. Nor has Stewart demonstrated that this is "the rare 'obvious case[]' where the unlawfulness of [Garcia's] conduct is sufficiently clear." See Wesby, 583 U.S. at 64 (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam)). Under such circumstances, Garcia is entitled to qualified immunity, and we affirm the district court's grant of summary judgment.

D.

Stewart also appeals the dismissal of his supervisory liability claim against Elliot. It is undisputed that Elliot did not directly participate in the tasing or arrest, but Stewart argues that he tacitly authorized Garcia's use of force. A supervisor may be liable for a subordinate's action "when 'he (1) had "notice of a pattern of unconstitutional acts committed by subordinates"; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take "sufficient remedial action"; (4) proximately causing injury to' the plaintiff[]." Sturgeon v. Faughn, 36 F.4th 804, 809 (8th Cir. 2022) (internal quotations omitted).

Stewart has failed to show Garcia had a pattern of using excessive force or that Elliot had notice of any such pattern. We affirm the district court's grant of summary judgment to Elliot on Stewart's supervisory liability claim.

E.

Finally, Stewart appeals the district court's grant of summary judgment to the City on his municipal liability claim. Stewart argues that the City's use of force policy was inadequate and that the City failed to train its officers on the proper use of tasers. "Where a policy is constitutional on its face, but it is asserted that a municipality should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a 'policy' by demonstrating that the inadequacies were a product of deliberate or conscious choice by

policymakers." Szabla v. City of Brooklyn Park, 486 F.3d 385, 390 (8th Cir. 2007) (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989)). "[O]nly where a municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the municipality be liable for an unconstitutional policy under § 1983." Id.

The Jonesboro Police Department's use-of-force policy directs officers to use no more force than is "lawful, reasonable, and necessary," and it defines "objectively reasonable" force as "[t]he amount of force that would be used by other reasonable and well-trained officers when faced with the circumstances with which the officer using the force is presented." The guidance on taser use merely directs officers to use tasers in accordance with the department's other use-of-force policies. Stewart fails to explain why these policies are not facially constitutional. Cf. Hollingsworth v. City of St. Ann, 800 F.3d 985, 992 (8th Cir. 2015) (holding a taser policy was not unlawful on its face). As a result, he must show the City was deliberately indifferent to his constitutional rights. See Szabla, 486 F.3d at 390. Stewart fails to do so. He offers no evidence that the City was on notice that its taser or use-of-force policies were inadequate, or any evidence that Garcia had previously violated either policy. Accordingly, we affirm the district court's grant of summary judgment to the City.

III.

We affirm.

GRUENDER, Circuit Judge, concurring in part.

I agree with the court that Officer Garcia is entitled to qualified immunity. I write separately to address Part II.C., which asserts that a reasonable factfinder could conclude that Officer Garcia was deliberately indifferent to Stewart's medical needs during the fourteen minutes preceding the arrival of the emergency medical

technicians.[12] Our caselaw squarely holds that deliberate indifference is a difficult standard to meet, and no reasonable factfinder could conclude under these facts that Stewart has met that standard.

To establish the subjective component of deliberate indifference, a reasonable factfinder must be able to conclude that (1) Officer Garcia actually knew of Stewart's serious medical needs *and* (2) deliberately disregarded those needs. *See Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009). Thus, the subjective component of deliberate indifference requires a showing of a mental state "equivalent [to] criminal recklessness." *Hodges v. Dep't of Corr.*, 61 F.4th 588, 592 (8th Cir. 2023). "[N]either negligence nor gross negligence are sufficient." *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017).

As to the first component—knowledge—it is not enough that a reasonable person would have known or should have known about Stewart's serious medical needs; rather, Stewart must show that those needs were so obvious that actual knowledge can be imputed to Officer Garcia. *See Krout*, 583 F.3d at 567. The court contends that a reasonable factfinder could impute actual knowledge to Officer Garcia because he knew that Stewart fell from the fence and he observed Stewart's physical conduct. *Ante*, at 11-12. While Officer Garcia saw Stewart go over the tall "privacy fence," he could not see how Stewart landed on the other side. After Stewart fell from the fence, he exhibited no external injuries. He communicated with Officer Garcia, offering justifications for his actions earlier that night. The first time that Stewart complained of pain was when Officer Garcia attempted to get him to stand. And within fifteen seconds of Stewart's first expression of pain, Officer Garcia asked Stewart if he needed an ambulance. Stewart responded twice that he did not require one. Our precedent permits Officer Garcia to take Stewart's response into account in assessing his medical needs. *See Smith-Dandridge v. Geanolous*, 97 F.4th 569, 577 (8th Cir. 2024) ("When [the decedent] was asked directly if he was

---

[12]The court agrees that Officer Garcia's conduct was objectively reasonable after those fourteen minutes. *See Ante*, at 12 n.8.

-17-

currently having any thoughts about killing or harming himself, he said no. It was reasonable for defendants to take [the decedent's] response into account." (internal quotation marks and alterations omitted)); *Thompson v. King*, 730 F.3d 742, 748 (8th Cir. 2013) (concluding that a reasonable factfinder could not infer knowledge when there did not appear to be external injuries to the decedent, "nothing indicate[d] his breathing was abnormal," the decedent was "conscious during the initial encounter," and the decedent answered the officer's questions). The severity of Stewart's injury was not obvious to *anyone* at the scene, including Officer Pigg and the emergency medical technicians.[13] Even Stewart himself pleaded multiple times with Officer Garcia to be let go. In imputing actual knowledge gleaned from hindsight that was neither knowable nor obvious at the time, the court improperly views the incident with hindsight's perfect vision. *See Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) ("We must avoid determining the question [of deliberate indifference] with hindsight's perfect vision." (internal quotation marks omitted)); *see also Smith-Dandridge*, 97 F.4th at 577 (concluding that, even though the decedent had exhibited "signs of paranoia and hallucination," a reasonable factfinder could not infer knowledge of a substantial risk of suicide because the decedent was "cooperative and conversational" and displayed symptoms "consistent with intoxication"); *Reece v. Hale*, 58 F.4th 1027, 1031 (8th Cir. 2023) (concluding no knowledge even though the officer had been told that the decedent "was acting as if he was having a seizure" and the officer did nothing about it (internal quotation marks and alterations omitted)).[14]

---

[13]As the district court found, "[t]he fact that trained medical personnel did not appreciate the extent of Stewart's injuries undermines any inference that a line officer should have recognized that Stewart had suffered a spinal injury."

[14]The court cites *Jackson v. Wilkins*, 517 F. App'x 311 (6th Cir. 2013)—an unpublished, out-of-circuit case—in support of its assertion that the severity of Stewart's injury was obvious. *Ante*, at 13 n.9. But *Jackson* is readily distinguishable from the present case. *See* 517 F. App'x at 318-19 (concluding that a reasonable jury could find that an officer actually knew of a substantial risk to the decedent's health when the officer witnessed the decedent collide with the metal arm of a dumpster in a manner "so violent" that he did a "back flip around it," the decedent pleaded for

-18-

The court also asserts that a reasonable factfinder could infer knowledge based on Officer Garcia's statements. *Ante*, at 12. Officer Garcia told Stewart that he would be going to jail "either way" and that he would "drag [him] either way." However, statements are not viewed in isolation and meaning is provided by context. In each instance that Officer Garcia made one of these statements, he told Stewart only moments prior to "quit acting." Construed together, the only reasonable inference that can be drawn is that Officer Garcia made those statements because he believed that Stewart was feigning injury. *See Poemoceah v. Morton Cnty.*, 117 F.4th 1049, 1053-56 (8th Cir. 2024) (affirming dismissal for lack of knowledge even though the officers made the plaintiff walk 200 feet after he was "violently tackled" by the officers, "cried out in pain," told the officers that he could not walk and thought his hip was broken, asked for an ambulance, and alleged that the officers had mocked and accused him of "playing games"). Similarly, the court also takes issue with Officer Pigg's statement: "Ma'am, he is hurt. He needs to go to the hospital." *Ante*, at 12. Officer Pigg made that statement in response to Stewart's girlfriend pulling on Stewart, which caused Stewart to fall sideways onto the ground. When the officers saw that Stewart had fallen over, they attempted to separate Stewart from his girlfriend. After the officers separated the two, Officer Garcia lifted Stewart back into a sitting position against the police vehicle to await the arrival of the emergency medical technicians. Rather than showing knowledge of the severity of Stewart's medical needs, context shows that the officers' statements reflect exasperation, disbelief, and concern. Officer Garcia's concern for Stewart's safety negates any inference of imputing actual knowledge to Officer Garcia.

With respect to the second component—deliberate disregard—Stewart must show that Officer Garcia acted with "a mental state akin to criminal recklessness and neither negligence nor gross negligence are sufficient." *Ryan*, 850 F.3d at 425 (internal quotation marks omitted). Our caselaw establishes the high burden imposed on a plaintiff who attempts to meet this standard. Take, for example, *Krout*,

help and defecated on himself, the officer perceived the decedent's "unusually rapid physical deterioration," and the officer testified that he recognized the decedent was injured).

-19-

where we reversed the district court's denial of qualified immunity to three correctional officers. 583 F.3d at 570. The correctional officers had observed a police officer deposit the detainee face down on the ground in the entryway of a detention center. *Id.* at 561. The detainee had lacerations and blood on his face, and he told the officers that (1) he could not stand up, (2) his back and legs were broken, and (3) he could not feel his legs. *Id.* The officers nonetheless pulled the detainee into a cell, where they laid him on his stomach. *Id.* at 561-62. Once there, an officer asked the detainee if he would like to see a doctor, but the detainee refused medical treatment. *Id.* at 562. The officers then left the detainee on the floor. *Id.* They checked on his condition every fifteen minutes and noted each time that he remained lying in the same position on the floor. *Id.* This continued for at least one hour, at which point the officers determined that medical professionals should examine the detainee notwithstanding his refusal to seek medical attention. *Id.* The detainee had suffered, among other things, a neck fracture and a spinal cord injury. *Id.* at 563. He died five days later from his injuries. *Id.*

We concluded that the officers in *Krout* had not deliberately disregarded the decedent's medical needs—even for the period of time before they sought medical attention. *Id.* at 568-69. We noted that (1) the officers had asked the decedent whether he required medical attention, (2) the decedent had refused medical attention, (3) the officers continued to check on the decedent every fifteen minutes, and (4) the officers eventually sought medical attention anyway. *Id.* These facts, we determined, undermined any inference that the officers had deliberately disregarded the decedent's serious medical needs. *Id.* And *Krout* is not an outlier in this circuit. It is in line with a robust consensus of cases showing that "[d]eliberate indifference is a difficult standard to meet." *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999); *see, e.g.*, *Carpenter v. Gage*, 686 F.3d 644, 650-51 (8th Cir. 2012) (concluding that officers had not been deliberately indifferent by transporting a plaintiff to a jail rather than a hospital even though the officers had been told that the plaintiff may have suffered a stroke and they overheard a first responder tell the plaintiff that he should go to a hospital for treatment); *Williams v. Kelso*, 201 F.3d 1060, 1065-66 (8th Cir. 2000) (concluding that an officer had not been deliberately

indifferent even though a doctor had instructed the officer to check the inmate's vital signs every four to six hours, such medical care was deemed "essential," the officer failed to follow the doctor's instructions, and the inmate subsequently died).

Here, the court holds Officer Garcia to a standard higher than prescribed by our precedent. The court asserts that a reasonable factfinder could infer deliberate disregard based on (i) Officer Garcia forcibly pulling Stewart to his feet, (ii) the repeated attempts to get Stewart to stand despite his cries of pain, (iii) the decision to drag Stewart across the lawn, and (iv) the officers' attempt to place Stewart into the police vehicle. *Ante*, at 12. When these acts are viewed within their proper context, none show disregard that rises to the level of criminal recklessness. At most, as the district court insinuated, these acts amount to negligence. With respect to (i), Stewart did not complain of pain until *after* Officer Garcia attempted to pull Stewart to his feet. Officer Garcia responded by setting Stewart down within seconds and offering to call an ambulance. As to (ii), it was only after Stewart refused medical treatment twice that Officer Garcia attempted to get Stewart to stand for the second time. And every time Stewart told Officer Garcia that he was in pain, Officer Garcia responded by setting Stewart down in a matter of seconds. As to (iii), the officers did not drag Stewart in a manner which caused pain. Each officer stood on one side of Stewart, lifted his upper body by the area between his shoulders and elbows, and pulled him across the lawn. Indeed, Stewart did not cry out in pain once while the officers moved him across the lawn. Only when the officers placed Stewart in an upright sitting position against the police vehicle did Stewart say "ow." The court asserts that the record does not reflect any reason for the officers moving Stewart before the emergency medical technicians arrived. *Ante*, at 12. However, in the body camera video, Officer Garcia stated that the officers should move Stewart so that they could put him in the police vehicle. Officer Garcia testified that, in his experience, emergency medical technicians would sometimes refuse to examine individuals who declined medical attention, in which case it was the officer's job to

take that individual to the hospital in his police vehicle.[15]  And finally, as to (iv), it was Stewart who requested that the officers help him off the ground.  When the officers lifted Stewart partially off the ground, he said, "Let me just try, please." Moments later, he said: "I can't use them."  Upon hearing this, the officers immediately placed Stewart back on the ground.[16]  Thus, none of the acts identified by the court, whether viewed individually or in the totality of those fourteen minutes, evidence criminal recklessness by Officer Garcia.

This circuit's robust body of caselaw delineates when an officer acts with a mental state equivalent to criminal recklessness.  Because a reasonable factfinder could not conclude under these facts that Officer Garcia's conduct amounted to criminal recklessness, I do not join the court as to that part of the opinion.[17]

———————————————

[15]After the emergency medical technicians examined Stewart, the officers took Stewart to the hospital in the police vehicle.

[16]After the officers placed Stewart back on the ground, Stewart told the officers: "I'm trying, really."  Officer Pigg responded, "You're not trying."  Officer Garcia reached down and felt Stewart's foot.  Thereafter, until the emergency medical technicians arrived, Officer Garcia neither attempted to lift Stewart off the ground nor allowed Stewart to stand, even though Stewart pleaded with Officer Garcia multiple times to be given the "chance" to stand.

[17]Because the court affirms the grant of qualified immunity to Officer Garcia on the basis that Stewart's constitutional right was not "clearly established," the court's statements concerning whether Officer Garcia's conduct constituted deliberate indifference are *dicta*. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the qualified immunity inquiry can be decided under either the "constitutional violation" prong or the "clearly established" prong).