RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0225p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

DAVID BRUEDERLE,

       *Plaintiff-Appellant*,

       *v.*

LOUISVILLE METRO GOVERNMENT, et al.

       *Defendants-Appellees*.

No. 11-5637

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:05-cv-818—Charles R. Simpson III, District Judge.

Decided and Filed:  July 24, 2012

Before:  SILER and KETHLEDGE, Circuit Judges; MURPHY, District Judge.[*]

_____

## COUNSEL

_____

**ON BRIEF:** Andrew J. Horne, ANDERSON & HORNE PLLC, Louisville, Kentucky, for Appellant. I. Joel Frockt, I.G. Spencer, Jr., JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, Sean Ragland, William P. Swain, Patricia C. Le Meur, PHILLIPS PARKER ORBERSON & MOORE, P.L.C., Louisville, Kentucky, for Appellees.

_____

## OPINION

_____

    STEPHEN J. MURPHY, III, District Judge.  David Bruederle had a severe seizure two days after being booked into the Louisville Metro Corrections jail on assault charges.  The seizure was likely caused by withdrawal from the many powerful prescription drugs Bruederle was taking at the time to control his back pain.  Because

_____

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

police arrested him after business hours on Friday, and he did not manifest an imminent danger of suffering withdrawal symptoms, Bruederle's request for these drugs could not be reviewed until the Monday after his arrest. To obtain redress for the injuries caused by the seizure, Bruederle brought a "deliberate indifference" claim pursuant to 42 U.S.C. § 1983 against the Louisville Metro Government ("Louisville"); Correctional Medical Services ("CMS"); Tom Campbell, the director of the jail; Dr. Lawrence Mudd, a psychiatrist at the jail; and two jail nurses, Cindy Payne and Wyllis Smith.[1] Bruederle now appeals the district court's order granting summary judgment to the defendants on this claim, as well as its order denying a Civil Rule 59(e) motion to alter or amend that judgment. Because we agree with the district court that no reasonable juror could find the defendants violated the Due Process Clause of the Fourteenth Amendment, we **AFFIRM**.

I.

A.

Louisville police arrested Bruederle and his wife, Kelly Bruederle, on December 3, 2004, on suspicion of assault.[2] The police took the Bruederles to the jail for booking. Louisville owns and operates the jail, and CMS provides health care to inmates at the jail under a municipal contract. At approximately 8:15 PM, Smith conducted an intake interview with Bruederle. In the interview, Bruederle told Smith about his history of back surgery, and that he was taking hydrocodone, Xanax, Paxil, Flexeril, and Ambien to manage his back pain. Bruederle Med. Records at 18–19, R. 128-2. He had gone almost a full day without taking any medication at the time of the interview. *Id.*

CMS and Bruederle do not agree on the identity of the interviewer. CMS claims it was Smith, a white woman, while Bruederle and his wife insisted in their depositions that the woman who gave the interview was black. At the time of the interview, both

---

[1]Because we find no merit to Bruederle's arguments regarding Smith's identity, we refer to her by name throughout this opinion. *See infra* at III.B.

[2]The authorities eventually dismissed the charges against the Bruederles.

Smith and Bruederle signed a form attesting that Smith gave Bruederle the screening interview, and the intake forms for Bruederle bear Smith's first initial and last name. *Id.* at 18. While Smith claims she has no specific memory of interviewing Bruederle, she testified in her deposition that she recognized her handwritten notes on the form and agreed that she had conducted the interview. Smith Dep. 9:21–25.

Bruederle did not express concerns about withdrawal, manifest withdrawal symptoms, or report a history of seizures to Smith. *Id.* According to CMS's diagnostic protocols, Bruederle presented a low risk for withdrawal that could be managed without medication. CMS Nursing Protocol at 56, R. 106-5. Medical authorities cited by Bruederle acknowledge that the precise trajectory of a particular individual's withdrawal symptoms is difficult to forecast. *See* Fed. Bureau of Prisons, *Clinical Practice Guidelines: Detoxification of Chemically Dependent Inmates*, at 4 (2000) (noting that while anxiolytics, like Xanax, and narcotics, like hydrocodone, can produce "dangerous withdrawal symptoms," "[t]he intensity of withdrawal cannot always be predicted accurately" due to "many factors including the physiology, psychology and neurochemistry of the individual using the substance"). Nonetheless, Smith noted that Bruederle presented at least some risk of withdrawal because he had not taken any of his medications since Thursday. Smith Dep. 13:4–6, R. 131-8. Therefore, as a precautionary measure, she assigned Bruederle to the jail's medical dormitory for individuals with a potential for drug withdrawal symptoms, and the jail authorities transferred him there on the morning of December 5. Bruederle Dep. 34:13–14; Smith Dep. 18:7–23, 27:23–28:1; Classification Chronological Notes, R. 111-5.

After his transfer, Bruederle claims that he asked jail nurses about receiving his medication because he was experiencing serious back pain and could neither sleep nor eat. The nurses denied his request, and Bruederle asserts he was told that there was "no way" he would get those sorts of medications in the jail and that he would have to "sleep [his] time off." Bruederle Dep. 65:9–66:4. But Bruederle did not testify to experiencing any withdrawal symptoms at that time.

During the evening hours of December 5, after spending most of the day lying around his cell, Bruederle suffered a sudden seizure when he attempted to stand up. Payne and several other jail officers responded by immediately placing Bruederle in a restraint chair and relocating him to a medical observation room. They contacted Mudd, who prescribed a standard detox regimen for Bruederle over the phone; Payne and other jail employees implemented the regimen. Bruederle Med. Records at 2. The intervention succeeded in stabilizing Bruederle's condition, and he returned to the medical dormitory around midnight. Nonetheless, he suffered compression fractures of three thoracic vertebrae, along with other injuries, as a result of the seizure. On Monday, prison nurses again refused to administer Bruederle's prescriptions, and dispensed Tylenol to alleviate the back pain. Bruederle Dep. 97:1–19. There were no further issues until Bruederle's release from jail on late Tuesday night or early Wednesday morning.

B.

Bruederle's claim centers on the jail's failure to provide him with his various prescription medications. Jail personnel would not have provided his medication before his seizure for at least two reasons. First, Bruederle's pharmacy had to verify the claimed prescriptions. Payne Dep. 27:13–16, R. 131-7. Smith claimed she sent the verification request to the pharmacy before leaving her shift the night of Bruederle's arrest, in keeping with her standard practice, but there is no explicit record of this transmission. Smith Dep. 39:20–40:3. The request was re-transmitted to Bruederle's pharmacy on December 7, and returned the same day. Bruederle Med. Records at 16. By that point, Bruederle had already endured his seizure and undergone the detoxification protocol prescribed by Mudd.

Second, even if the pharmacy verified the prescriptions in a timely manner, jail procedures required that a CMS physician screen and approve all prescription drug requests. Payne Dep. 29:11–16. CMS does not staff a physician to review these requests over the weekend. Therefore, since Bruederle was brought into the jail on a Friday evening, his prescriptions could not be reviewed and approved until the Monday

following his arrest, at the earliest. Bruederle Med. Records at 17; Smith Dep. 39:12–40:1. The only exception to this rule, according to the nurses who gave deposition testimony in this case, would have been in an emergency situation in which the medicine could be deemed "life-sustaining." Payne Dep. 28:2–18.

Even if a physician had been available to review his request and the pharmacy verified his prescriptions promptly, the defendants concede that it was highly unlikely that Bruederle would have received Xanax and hydrocodone. According to CMS, its doctors have the discretion to prescribe and approve whatever medicines they deem appropriate for patients. But according to Mudd, inmates use certain drugs, such as Xanax and hydrocodone, as a form of jailhouse currency, which can lead to violence against fellow inmates and staff. Mudd Dep. 50:2-15, R. 131-6. Therefore, whenever it is feasible, physicians avoid prescribing these drugs, or provide an alternative medication. While defendants agreed that it would be an exceedingly rare case in which narcotics would be approved, they also insist there was no per se rule against prescribing them.

## C.

Bruederle brought his lawsuit against a number of known and unknown jail employees, CMS, Louisville, and Tom Campbell, the Director of the Louisville Metro Department of Corrections, in state court in Kentucky, alleging violations of state tort law and federal civil rights law. Defendants removed the matter to federal district court. On December 18, 2009, the district court granted motions for summary judgment filed by the defendants on Bruederle's § 1983 claims. The district court agreed with Bruederle that his need for medication was objectively serious, but found that the defendants had not been deliberately indifferent to Bruederle's medical needs. The defendants also won summary judgment on the alleged "no narcotics" policy at the jail. The district court ruled that it was not unconstitutional to place decisions regarding what drugs to prescribe to inmates in the hands of jail physicians, even assuming that physicians occasionally exhibit deliberate indifference in prescribing medication. In

doing so, the district judge rejected Bruederle's contentions about the existence of a "no narcotics" policy as lacking support in the record.

After the district court made its ruling, Bruederle moved to alter, amend, or vacate the order under Civil Rule 59(e). He presented new evidence from two witnesses he had not called upon in opposing the motion for summary judgment—Laura McKune, the former Deputy Director of the Metro Department of Corrections; and Donald L. Leach, a nationally recognized jail consultant. McKune submitted an affidavit stating that Metro had an explicit "no narcotics" policy, contradicting the defendants' statements that jail physicians had the discretion to provide these drugs. Leach gave a deposition in which he claimed there was no penological or security justification for denying narcotic pain medication to a prisoner that had been prescribed such drugs.

For purposes of deciding the motion, the district court assumed that Bruederle had only become aware of McKune's views after the initial motion hearing, and that the affidavit created a question of fact as to the existence of a policy or custom at the jail. Nonetheless, the court denied Bruederle's requested relief in an order dated July 12, 2010, on two grounds. First, the McKune affidavit did not demonstrate the jail staff's awareness of a serious risk of harm, or conscious disregard of such a risk. Second, regardless of whether the jail had a "no narcotics" policy, no drug could have been approved for Bruederle's use prior to the seizure because of the jail's rules on verification and approval of prescriptions, which Bruederle did not challenge. The district judge did not address the Leach deposition testimony, apparently because it was moot in light of the latter finding.

On April 20, 2011, the district court declined to continue exercising jurisdiction over Bruederle's state-law claims, and remanded his case to state court. *See* 28 U.S.C. § 1367(c)(3). Bruederle now appeals the grant of the defendants' motion for summary judgment and the denial of his Civil Rule 59(e) motion. We have jurisdiction over the appeal of the district court's final decision. *See id.* § 1291.

II.

We review a district court's decision to grant summary judgment de novo. *Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[ ] to particular parts of materials in the record" or "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Bruederle has also appealed the district court's denial of his Civil Rule 59(e) motion to alter the judgment. Typically, the denial of such a motion is reviewed for an abuse of discretion, but "when the . . . motion seeks review of a grant of summary judgment, . . . we apply a de novo standard of review." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) (emphasis removed). Therefore, we apply the same level of scrutiny to our review of both orders.

III.

A.

During his brief detention at the jail, Bruederle had "a right to adequate medical treatment . . . analogous to the Eighth Amendment rights of prisoners" under the Due Process Clause of the Fourteenth Amendment. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001). We therefore analyze Bruederle's claim under the familiar, two-part test used in evaluating Eighth Amendment claims. First, Bruederle must demonstrate "the existence of a 'sufficiently serious' medical need." *Blackmore v.*

*Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). If a failure to treat a particular condition would deny the inmate "the minimal civilized measure of life's necessities," it meets this "objective" prong. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Second, he must show that the officials in question "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is characterized by obduracy or wantonness—it cannot be predicated on negligence, inadvertence, or good faith error." *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012).

In addition to his "deliberate indifference" claim against those involved directly in his treatment, Bruederle must show that "a policy or custom of the municipality was the 'moving force' behind the deprivation of [his] rights" to hold Louisville, CMS, or Campbell liable for his treatment. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010). "A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy, connect the policy to the [municipal actor] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1994). A plaintiff's failure to demonstrate constitutional harm defeats municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[None] of our cases authorize[ ] the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."). This standard also applies to CMS and Campbell, even though CMS is a private corporation and Campbell is an individual. *See Fisher v. Overton*, 124 F. App'x 325, 328 (6th Cir. 2005) (standard applies to director of a Michigan prison who had no personal involvement in alleged misconduct); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 817–18 (6th Cir. 1996) (standard applies to private company engaged to run correctional facility).

B.

In prior cases, we have articulated Bruederle's concerns about complete withdrawal of addictive substances such as Xanax and hydrocodone. *See French v. Daviess Cnty.*, 376 F. App'x 519, 522 (6th Cir. 2010) ("Xanax is a highly addictive medication, which can cause serious withdrawal symptoms like seizures and delirium if discontinued abruptly. . . . Courts have found withdrawal symptoms to qualify as a serious medical need.") (citations omitted). But as the district court found below, this case does not implicate a systematic policy on controlled substances. Smith determined that Bruederle was not in immediate need of his prescriptions or treatment for withdrawal. Therefore, because the drugs were not "life-sustaining," he could not have received any medication until Monday, a day after the seizure took place, because there was no physician available to review and approve prescription requests. Even if we were to accept Bruederle's argument that the jail has a "no narcotics" policy, it had no opportunity to apply it in this case. Nor did the jail have a chance to provide alternative medication that might have addressed Bruederle's pain needs and reduced the risk of withdrawal. *Id.* (recognizing that detoxification protocols involving substitute drugs are a constitutionally permissible way to address withdrawal issues associated with a deprivation of Xanax). We therefore cannot find that Bruederle's injury "flowed from the execution of" a policy regarding the categorical prohibition of any particular drug. *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010).

Bruederle did not challenge the legitimacy of the screening requirements below. *See J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991) ("[I]ssues not presented to the district court but raised for the first time on appeal are not properly before this court."). Moreover, there is no per se constitutional objection to reasonable policies that regulate the access of prisoners to controlled substances, including prescription drugs. *See Bell v. Wolfish*, 441 U.S. 520, 540 (1979) (recognizing that reasonable restraints imposed by a prison to "make certain no . . . illicit drugs reach detainees" do not constitute violations of the Eighth Amendment); *see also Williams v. Guzman*, 346 F. App'x 102, 105 (7th Cir. 2009) (finding that plaintiff

presented "no evidence that might suggest the doctors acted unreasonably by not ordering Amitriptyline before first verifying [plaintiff's] condition and the prescription with his neurologist"). Bruederle argues on appeal that the screening policies should be disregarded because the jail did not approve his prescriptions after his seizure. But by that point, the jail and CMS had responded to the seizure and implemented a detoxification regimen for Bruederle. He does not—and could not—argue that CMS and jail officials were deliberately indifferent to his drug withdrawal concerns during and after the seizure.

Bruederle's claim of "deliberate indifference" appears to hinge on whether Smith's application of the jail's policies on administering controlled substances at the screening interview represented deliberate indifference. We agree with the district court's conclusion that it did not. Smith recognized that Bruederle presented at least some risk of withdrawal symptoms, including seizure, because of the medications he was taking. But it was within reasonable medical judgment to conclude Bruederle did not pose a withdrawal risk requiring immediate medication, given his lack of a seizure history and the absence of withdrawal symptoms. Smith acted on her observations by placing Bruederle in the medical dormitory, where he could be monitored more closely than he would be in the general prison population. No reasonable juror could find that Smith knew Bruederle required further attention. *See Farmer*, 511 U.S. at 837 ("[T]he official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). At best, Bruederle might argue that Smith should have known he would suffer a seizure or should have taken more aggressive precautionary steps, but that is the language of medical malpractice, not deliberate indifference. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) ("[I]t is not enough for a plaintiff to demonstrate a question of fact whether [officers] *should have known*" relevant details of an inmate's condition). While it is true that a nurse or doctor in a jail may be held liable for providing "[m]edical care which is so cursory as to amount to no treatment at all," that is not what happened here, and summary judgment is therefore appropriate. *Terrance v. Northville Reg'l*

*Psychiatric Hosp.*, 286 F.3d 834, 843–44 (6th Cir. 2002) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

Bruederle also argues that even if the defendants were not deliberately indifferent to his withdrawal risk, they were deliberately indifferent to the pain he suffered while he could not get access to pain medication. But there is no evidence to suggest that the failure of the jail to verify Bruederle's prescriptions until Tuesday was a result of anything more than negligence or mistake on the part of the defendants in administering the screening policies. Moreover, "'an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Blackmore*, 390 F.3d at 898 (alteration omitted) (quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)). Bruederle has provided no "verifying medical evidence" that would prove the pain he suffered by this relatively brief deprivation had, in and of itself, any effect on his prognosis. *See also Mack v. Wilkinson*, 79 F. App'x 137, 139 (6th Cir. 2003) (rejecting "Eighth Amendment claim based upon . . . ten-day delay in the receipt of" Naprosyn intended to treat plaintiff's severe back pain because of the absence of "verifying medical evidence"); *Rumsey v. Martin*, 28 F. App'x 500, 502 (6th Cir. 2002) (finding delay in prescription of inhalers did not constitute an Eighth Amendment violation because plaintiff did "not submit[ ] medical evidence which clearly shows that his condition deteriorated because of a delay"). The district court's finding that no deliberate indifference was shown towards Bruederle's pain-management needs was therefore proper.

Finally, we must address the statements of Bruederle and his wife about the identity of the nurse who interviewed him. We conclude that they do not defeat summary judgment. Bruederle cannot overcome the document he signed at the time of his arrest attesting that Smith interviewed him, as well as the documentation from that interview and Smith's deposition testimony identifying her handwriting, name, and notes on the documents. There is no *genuine* dispute that anyone other than Smith conducted the interview. *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) ("[T]he

court is not obliged to, and indeed should not, rely on the nonmovant's version [of the facts] where it is 'so utterly discredited by the record' as to be rendered a 'visible fiction.'") (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007))*; see also Whitaker v. Wallace*, 170 F.3d 541, 543 n.1 (6th Cir. 1999) (concluding that an affidavit filed with a summary judgment motion which "directly contradict[ed]" the plaintiff's "deposition testimony and other evidence in the record" on a factual point did not create a genuine factual dispute).  Civil Rule 56 does not permit trials to go forward on "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position[.]" *Liberty Lobby*, 477 U.S. at 252.

## C.

There are three final matters left for us to attend to.  First, while we do not condone the rough language with which some CMS nurses allegedly addressed Bruederle when he sought medication after his initial screening, accusations of "verbal abuse" against unnamed jail employees cannot create an actionable Eighth Amendment claim. *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987).  These statements had no connection to the delay of Bruederle's prescriptions.  Second, because the "no narcotics" policy is not implicated in this case, the district court correctly denied Bruederle's Civil Rule 59(e) motion.  The presence or absence of a "no narcotics" policy at the jail is not relevant to this case.  Third, since we have found that Bruederle did not endure a constitutional violation during his stay in the jail, the district court properly granted summary judgment in favor of Louisville, CMS, and Campbell. *See Heller*, 475 U.S. at 799.

## IV.

No reasonable juror could conclude on the record in this case that the defendants' handling of Bruederle's medical conditions constituted a violation of the Due Process Clause.  Therefore, we **AFFIRM** the judgment of the district court granting the defendants' motions for summary judgment on Bruederle's federal civil rights claims and denying Bruederle's Civil Rule 59(e) motion.