RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LAUREN BRIDGES, as Guardian of S.B., a minor,

  *Plaintiff-Appellant*,

  *v.*

MAXUM INDEMNITY COMPANY; LANDMARK AMERICAN
INSURANCE COMPANY,

  *Defendants-Appellees*.

┐
│
│
│
│
├  No. 25-1911
│
│
│
│
┘

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:24-cv-10139—Matthew F. Leitman, District Judge.

Argued:  June 3, 2026

Decided and Filed:  June 29, 2026

Before:  BOGGS, CLAY, and GILMAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**   Douglas Young, YOUNG INSURANCE LAW, Royal Oak, Michigan, for
Appellant.   Jonathan Freiman, WIGGIN AND DANA LLP, New Haven, Connecticut, for
Appellee Maxum Indemnity Company.  Brian C. Bassett, TRAUB LIEBERMAN STRAUS &
SHREWSBERRY LLP, Chicago, Illinois, for Appellee Landmark American Insurance
Company. **ON BRIEF:** Douglas Young, YOUNG INSURANCE LAW, Royal Oak, Michigan,
for Appellant.  Jonathan Freiman, WIGGIN AND DANA LLP, New Haven, Connecticut, for
Appellee Maxum Indemnity Company.   Brian C. Bassett, Jason M. Taylor, TRAUB
LIEBERMAN STRAUS & SHREWSBERRY LLP, Chicago, Illinois, for Appellee Landmark
American Insurance Company.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.　This case involves the contractual interpretation of two legal-malpractice insurance policies under Michigan law. The underpinning of the case began in January 2017, when Lauren Bridges filed a medical-malpractice lawsuit in Alaska state court.　That lawsuit was ultimately dismissed in January 2022 because Bridges's counsel, the Michigan-based law firm of McKeen & Associates, P.C. (McKeen), had failed to respond on her behalf to the healthcare providers' motions for summary judgment.　Bridges accordingly asserted a legal-malpractice claim against McKeen the following month.

During its representation of Bridges, McKeen maintained legal-malpractice insurance policies with three different insurers:　Maxum Indemnity Company (Maxum), StarStone Specialty Insurance Company (StarStone), and Landmark American Insurance Company (Landmark).　Each insurer, however, refused to defend or indemnify McKeen against Bridges's legal-malpractice claim.

McKeen thereafter settled with Bridges and assigned to her all of its rights under the three insurance policies.　Bridges then brought suit in the United States District Court for the Eastern District of Michigan, alleging that her legal-malpractice claim was covered under each policy.　Maxum and Landmark (but not StarStone) moved to dismiss.　The district court granted their motions in November 2024, concluding that the policies' plain language unambiguously precluded coverage.　For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I.　BACKGROUND**

Bridges's medical-malpractice suit involved the birth of her daughter, SB.　She alleged that SB was born with severe disabilities as a result of the defendants' negligent care during labor and delivery.　McKeen served as Bridges's counsel in that action.

During its representation of Bridges, McKeen's three legal-malpractice insurance policies had varying terms and conditions. The Policy Period under the Maxum Policy ran from May 2, 2018 to May 2, 2019. McKeen also purchased an "Optional Extended Reporting Period" with Maxum, which extended certain coverage under the Policy for an additional two years—from July 2, 2019 to July 2, 2021.

The Policy Periods under the StarStone Policy and the Landmark Policy, on the other hand, both ran from May 2, 2019 to May 2, 2020. Primary coverage during that period was provided by the StarStone Policy, with the Landmark Policy providing excess coverage.

Between June and July 2018, the Alaska trial court dismissed all of Bridges's claims after McKeen failed to timely respond on her behalf to the defendants' motions for summary judgment. The court later denied Bridges's motion for reconsideration, and it entered judgment in favor of the defendants in October 2018. In April 2019, however, the court granted Bridges's motion for relief from judgment and reinstated the case. The defendants appealed that ruling to the Alaska Supreme Court the following month.

In light of these events, McKeen notified Maxum and StarStone on April 20, 2020 and May 23, 2020, respectively, of a potential legal-malpractice claim by Bridges. Maxum and StarStone both acknowledged receipt of McKeen's notice and assigned claim numbers to the potential claim. Bridges alleges, upon information and belief, that McKeen informed Landmark of the potential claim around this time as well.

In January 2022, following delays attributable to the COVID-19 pandemic, the Alaska Supreme Court reversed the trial court's decision to reinstate the case and remanded with instructions to enter final judgment in favor of the defendants. It denied Bridges's motion for rehearing the following month. As a result, Bridges asserted a legal-malpractice claim against McKeen on February 18, 2022. Maxum, StarStone, and Landmark each declined to defend or indemnify McKeen against Bridges's claim.

McKeen subsequently settled with Bridges and assigned to her all of its rights under the three insurance policies. Bridges then filed the instant suit against Maxum, StarStone, and Landmark in January 2024, asserting claims for a declaratory judgment and for breach of

contract.  Maxum and Landmark (but not StarStone) filed motions to dismiss the claims against them, which the district court granted in November 2024.  At the same time, the court denied Bridges's motion to amend her complaint, wherein she sought to add additional claims that Maxum, StarStone, and Landmark had acted in bad faith.

Bridges and StarStone later stipulated to the dismissal without prejudice of all claims against StarStone in order for a final judgment to be entered regarding the other parties.  This timely appeal followed, in which Bridges challenges only the district court's dismissal of her claims against Maxum and Landmark.

## II.     ANALYSIS

### A.     Standard of review

"When considering a motion to dismiss under Rule 12 [of the Federal Rules of Civil Procedure], we review the district court's decision de novo."  *Booth Fam. Tr. v. Jeffries*, 640 F.3d 134, 139 (6th Cir. 2011).  "We construe the complaint in the light most favorable to the plaintiffs, accept all of the complaint's factual allegations as true, and decide whether the plaintiffs can prove any set of facts in support of their claims that would entitle them to relief."  *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).  Although review at this stage is generally limited to "the complaint's allegations, . . . we may look outside the four corners of the complaint and consider materials attached to a motion to dismiss if they are referred to in the complaint and central to the claim."  *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 637 (6th Cir. 2016).  Here, because Bridges attached the three insurance policies at issue to her complaint, and because each of these policies is central to her claims, we may consider them in resolving the issues on appeal.

The parties agree that Michigan law governs the interpretation of these policies.  Under Michigan law, "an insurance contract must be interpreted like any other contract."  *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 38 (Mich. 2005).  We "must always begin with the actual language used by the parties in the insurance policy itself" to "determine the intent of the contracting parties."  *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 122 (Mich. 2005) (Young, J., concurring).  In addition, we must "read [the] contract[] as a

whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003). "If the text of the insurance policy is clear and unambiguous, the contract must be enforced as written." *City of Grosse Pointe Park*, 702 N.W.2d at 122 (Young, J., concurring). "The construction and interpretation of an unambiguous contract is a question of law." *Rossow v. Brentwood Farms Dev., Inc.*, 651 N.W.2d 458, 461 (Mich. Ct. App. 2002).

Different rules apply, however, if the language of the insurance policy is ambiguous. "An insurance contract is ambiguous when its provisions are capable of conflicting interpretations." *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999). "Accordingly, if two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). "[W]hether contract language is ambiguous is a question of law." *Id.* at 451.

We must "not create ambiguity where the terms of the contract are clear." *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999). But where a true ambiguity exists, then "the question of interpretation should be submitted to the jury, under proper instructions." *Klapp*, 663 N.W.2d at 454 (quoting *O'Connor v. March Automatic Irrigation Co.*, 218 N.W. 784, 787 (Mich. 1928)). The jury must then interpret the contract "in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning." *Id.* (quoting 11 Williston, Contracts (4th ed.), § 30:7). If an insurance contract ultimately "is ambiguous and the parties' intent cannot be discerned from extrinsic evidence, the contract should be interpreted against the insurer." *Wilkie*, 664 N.W.2d at 786.

**B.     The district court did not err in dismissing Bridges's contract claims against Maxum**

### 1.   *The relevant language from the Maxum Policy*

We begin with an overview of the relevant language from the Maxum Policy. Because, for the purposes of this case, the insurer—referred to in the Policy as "we," "us," "our," and "the Company"—is Maxum, and the insured—referred to as "you," "your," "the Insured," and "the

Named Insured"—is McKeen, we have substituted the parties' names into the Policy language in brackets for the sake of clarity.

> Section 1.A. sets forth the scope of coverage:

> [Maxum] shall pay on behalf of [McKeen] those sums in excess of the deductible [McKeen] becomes legally obligated to pay as "Damages" and "Claims Expenses" as a result of a "Claim" first made against [McKeen] and reported to [Maxum] in writing during the "Policy Period" or "Extended Reporting Period", by reason of a "Wrongful Act" in the performance of or failure to perform "Professional Services" by [McKeen].

The Policy's preamble also states that "[n]o coverage exists for Claims first made against [McKeen] and reported to [Maxum] after the end of the Policy Period unless, and to the extent, an Extended Reporting Period applies." (capitalization altered).

> Section VII contains an additional list of conditions for coverage. Relevant here are the conditions for providing notice of claims to Maxum under Section VII.B. Under the heading "Notice of an Actual 'Claim,'" the Policy states:

> As a condition precedent to [Maxum's] obligations under this Policy, [McKeen] shall give written notice to [Maxum] as soon as practicable, but in no event later than 60 days after the end of the "Policy Period" of any "Claim" made against [McKeen].

As an exception to this condition, Section VII.B. allows McKeen to provide "Notice of a Potential 'Claim'" instead:

> If during the "Policy Period" [McKeen] shall become aware of any "Wrongful Act" that may reasonably be expected to be the basis of a "Claim" against [McKeen] and if [McKeen] shall during the "Policy Period" give written notice to [Maxum] of such "Wrongful Act" and the reason for anticipating a "Claim", . . . then any such "Claim" that may subsequently be made against [McKeen] arising out of such "Wrongful Act" shall be deemed for the purposes of this insurance to have been made during the "Policy Period".

The definitions of the various defined terms used in these provisions are provided in Section II. A "Claim" is defined as "a written demand for monetary damages arising out of or resulting from the performance of or failure to perform 'Professional Services'." And "Policy

Period" is defined as "the period of time shown in Item 2. of the Declarations," which is "5/2/2018 to 5/2/2019 at 12:01 a.m. standard time." (capitalization altered).

The "Extended Reporting Period," on the other hand, is defined in Section VIII. That section begins with the statement that "[i]n the event of cancellation or non renewal of this Policy, . . . [McKeen] shall have the right to an Extended Reporting Period." There are two types of Extended Reporting Periods. The first type is the "Automatic Extended Reporting Period," found in Section VIII.A., wherein

> [c]overage as provided under this Policy shall automatically continue for a period of sixty (60) days following the effective date of such cancellation or non renewal, but only with respect to "Claims" for "Wrongful Acts" committed before the effective date of such cancellation or non-renewal.

The second type is the "Optional Extended Reporting Period," found in Section VIII.B., wherein

> [McKeen] shall have the right, upon payment of one of the additional premium options set forth in the Declarations, to an extension of the coverage provided under this Policy for the term set forth in the Declarations following the effective date of such cancellation or non renewal, but only with respect to "Claims" for "Wrongful Acts" committed before the effective date of such cancellation or non renewal.

McKeen elected to purchase an Optional Extended Reporting Period, according to the "Supplemental Extended Reporting Period" endorsement attached to the end of the Policy. That endorsement states:

> In consideration of an additional premium of $225,000 it is agreed that Section V, paragraph 3., Supplemental Extended Reporting Period, is hereby exercised and in full force and effect for a period of 2 years. The Basic Extended Reporting Period is automatically provided for a period of 30 days after the termination date of the policy. The Supplemental Extended Reporting Period begins at the end of the Basic Extended Reporting Period, or on 07/02/2019, and will remain in effect for a period of 2 years.

Notably, however, the endorsement refers to a "*Supplemental* Extended Reporting Period" rather than an "*Optional* Extended Reporting Period" as described in the main body of the Policy. (emphases added). In addition, the endorsement cites "Section V, paragraph 3," but the Policy contains no such provision. The terms governing the Optional Extended Reporting Period instead appear in Section VIII.B.

## 2. Bridges's legal-malpractice claim is not covered under the plain language of Section VII.B. because McKeen failed to provide timely notice of that claim

The sole issue on appeal with regard to Maxum is whether McKeen timely reported Bridges's legal-malpractice claim. Under Section VII.B., a "condition precedent" to coverage is that McKeen must "give written notice" of a claim to Maxum "no later than 60 days after the end of the 'Policy Period.'" The same section, however, also contains an exception addressing "Notice of a Potential 'Claim'":

> If during the "Policy Period" [McKeen] shall become aware of any "Wrongful Act" that may reasonably be expected to be the basis of a "Claim" against [McKeen] and if [McKeen] shall during the "Policy Period" give written notice to [Maxum] of such "Wrongful Act" and the reason for anticipating a "Claim", . . . then any such "Claim" that may subsequently be made against [McKeen] arising out of such "Wrongful Act" shall be deemed for the purposes of this insurance to have been made during the "Policy Period".

In other words, an actual claim will be deemed timely even if it is reported more than 60 days after the end of the Policy Period as long as a potential claim arising from the same alleged malpractice was previously reported during the Policy Period.

Here, McKeen did not report an actual claim by Bridges until February 2022, which was long after the end of both the Policy Period (May 2018 to May 2019) and the Optional Extended Reporting Period (July 2019 to July 2021). Coverage is therefore presumptively unavailable because of Section VII.B.'s condition precedent. *See Archambo v. Laws. Title Ins. Corp.*, 646 N.W.2d 170, 176 (Mich. 2002) ("A 'condition precedent' is a condition that must be met by one party before the other party is obligated to perform."); *see also State Farm Mut. Ins. Co. v. Moore*, No. 190964, 1997 WL 33353317, at *1 (Mich. Ct. App. Feb. 28, 1997) ("Where a party fails to satisfy a condition precedent to an insurer's duty to provide coverage, the party has no cause of action against the insurer.").

But McKeen had previously reported a related potential claim by Bridges in April 2020, which was during the Optional Extended Reporting Period (July 2019 to July 2021), though still well after the Policy Period itself. The question, then, is whether Section VII.B.'s

potential-claims exception applies despite the potential claim being reported during the Optional Extended Reporting Period rather than during the Policy Period.

We conclude that the exception does not apply. As the district court held, the plain language of the Section VII.B. exception requires potential claims to "be reported during the 'policy period' (not the 'extended reporting period') for coverage to apply to a subsequent actual claim." The exception twice uses the specific words "during the 'Policy Period'" to describe when potential claims must be discovered and reported. And the term "Policy Period" is specifically defined in Section II as "the period of time shown in Item 2. of the Declarations," which is "5/2/2018 to 5/2/2019 at 12:01 a.m. standard time." (capitalization altered). Because no potential claim was reported between May 2018 and May 2019, and McKeen's notice of Bridges's potential claim occurred only thereafter, the notice occurred too late for the exception to apply.

Bridges's sole argument to the contrary is that the discrepancy between the endorsement's reference to a "*Supplemental* Extended Reporting Period" and the main Policy's reference to an "*Optional* Extended Reporting Period" (emphases added) renders the scope of coverage ambiguous. But this discrepancy does not reflect an "irreconcilabl[e] conflict" between the relevant Policy terms, *see Klapp*, 663 N.W.2d at 453—rather, it is best understood as simply a scrivener error.

Reading the Policy and the endorsement "as a whole," and giving them a "harmonious effect," *Wilkie*, 664 N.W.2d at 781 n.11, the parties' intent is clear. The Policy contains no reference to a "Supplemental Extended Reporting Period," and the endorsement provides no independent definition of that term. Instead, the endorsement uses the term "Supplemental" to describe an Extended Reporting Period that McKeen could elect to purchase. This is a concept that the Policy itself recognizes, albeit under the label "Optional Extended Reporting Period."

The only reasonable reading, then, is that the terms "Supplemental" and "Optional" have the same meaning. Accordingly, the inconsistent usage of these words fails to create an ambiguity. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Est. of Fortin*, 29 N.W.3d 665, 676–77 (Mich. Ct. App. 2024) (noting that scrivener errors do not create ambiguity if they "obviously do

not express the intentions of the parties"); *see also Irwin v. North*, No. 219115, 2000 WL 33419365, at *2 (Mich. Ct. App. May 26, 2000) (explaining that scrivener errors are distinct from ambiguous language).

And even if this discrepancy created an ambiguity, Bridges fails to explain how it would impact the interpretation of Section VII.B.'s notice provisions. Section VII.B. does not reference either the "Optional Extended Reporting Period" or the "Supplemental Extended Reporting Period," so the notice provisions would not be rendered ambiguous regardless of any possible uncertainty in the meaning of the term "Extended Reporting Period."

Bridges, moreover, cannot rely on a purported ambiguity elsewhere in the Policy to manufacture an ambiguity in the relevant notice provisions of Section VII.B. *See Schoening Inv. LP v. Cincinnati Cas. Co.*, 170 F.4th 1006, 1014 (6th Cir. 2026) (holding that, under Kentucky law, "speculation that 'various' other parts of the contract might be 'ambiguous'" was "'irrelevant'" because "'[n]o ambiguity exists in the language'" of the provision at issue (citation omitted)). Similarly here, the discrepancy between the endorsement and the main Policy concerning the adjectives used to identify the Extended Reporting Period does not affect the meaning of Section VII.B.'s plain language regarding notice. So the notice language "must be enforced as written." *See City of Grosse Pointe Park*, 702 N.W.2d at 122 (Young, J., concurring).

Because the notice language requires potential claims to be reported during the Policy Period (which by definition excludes the Extended Reporting Period), Section VII.B. unambiguously precludes coverage under Maxum's legal-malpractice policy. We therefore affirm the dismissal of Bridges's contract claims against Maxum.

## C. The district court did not err in dismissing Bridges's contract claims against Landmark

### 1. The relevant language from the Landmark Policy

We turn next to Bridges's claims against Landmark. Section I of the Landmark Policy provides that "[t]his policy shall provide coverage in accordance with the same terms, conditions and limitations of the Followed Policy." The term "Followed Policy" is defined in Section II.D.

as "the policy identified in Item 6. of the Declarations," which is the StarStone Policy. The StarStone Policy thus defines the scope of coverage under the Landmark Policy.

Section III of the StarStone Policy contains a list of exclusions to coverage. One of these exclusions, under Section III.C., provides that "[t]his Policy does not apply to any Claim made against the Insured . . . based upon, arising out of, directly or indirectly resulting from, or in any way involving any Wrongful Act prior to the Retroactive Date." The term "Wrongful Act" is defined in Section II.P. as "any actual or alleged act, error, omission, or Personal Injury arising out of Professional Services rendered by an Insured for others." And the term "Retroactive Date" is defined in Section II.O. as "the date specified in Item 6 of the Declarations," which is May 2, 2019.

### 2. *Coverage is unavailable under the Landmark Policy as a matter of law*

The district court determined that Bridges's legal-malpractice claim is not covered under the Landmark Policy because it falls under the exclusion set forth in Section III.C. of the StarStone Policy. Specifically, the court reasoned that the Wrongful Act "giving rise to [Bridges's] claim was McKeen's failure to timely respond to summary judgment motions in 2018, before the retroactive date of May 2, 2019," and that "[w]rongful acts that occurred before that date are clearly excluded from coverage under the Landmark policy." On that basis, the court dismissed Bridges's contract claims against Landmark.

Bridges does not challenge this reasoning in her opening brief. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (explaining that "arguments not raised in a party's opening brief . . . are waived"). Instead, she advances an entirely new argument for why dismissal was improper. Bridges contends that because the Landmark Policy is a follow-form policy that incorporates the StarStone Policy, "[d]etermining Landmark's exposure will require the interpretation of the StarStone Policy." But because StarStone answered Bridges's complaint instead of filing a motion to dismiss, she argues that dismissing her contract claims against Landmark would be "premature" and "risks piecemeal adjudication and inconsistent rulings regarding the same underlying policy language and facts."

The main problem with Bridges's argument is that she failed to raise it before the district court. "[I]ssues not presented to the district court but raised for the first time on appeal are not properly before this court." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 777–78 (6th Cir. 2012) (quoting *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991)). And although we have discretion to hear new arguments if "failure to consider the issue will result in a plain miscarriage of justice," *In re Hood*, 319 F.3d 755, 760 (6th Cir. 2003) (quoting *Overstreet v. Lexington–Fayette Urb. Cnty. Gov't,* 305 F.3d 566, 578 (6th Cir. 2002)), no such circumstances are present here because Bridges had the opportunity to raise this argument below when StarStone answered her complaint before she filed her opposition to Landmark's motion to dismiss, yet she failed to do so.

And even if we were to reach the merits of this argument, it would fail. Contract interpretation is a question of law, *Rossow*, 651 N.W.2d at 461, and we must interpret unambiguous contractual language according to its plain meaning without resort to extrinsic evidence, *City of Grosse Pointe Park*, 702 N.W.2d at 123 (Young, J., concurring). Because Bridges does not contend that either the Landmark Policy or the StarStone Policy is ambiguous, there is no reason why we cannot interpret those policies at this stage of the proceedings. Moreover, Bridges's assertion that granting Landmark's motion to dismiss would result in "inconsistent rulings" with respect to Bridges's future claims against StarStone is unpersuasive. Coverage under the Landmark Policy and the StarStone Policy is coextensive, and under the policies' plain language, Landmark is not obligated to cover Bridges's claim. We therefore have no reason to believe that the district court would reach a different conclusion as to StarStone.

Because Bridges advances no other argument as to why her legal-malpractice claim should be covered under the Landmark Policy, there is no valid basis to disturb the district court's ruling. We therefore affirm the dismissal of Bridges's contract claims against Landmark.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.